# EXHIBIT C

Circuit Court for Baltimore County
Case No. 03-C-16-008420

<u>UNREPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 372

September Term, 2017

_____

FRIENDS OF LUBAVITCH, INC.

v.

ROBIN ZOLL, *et al.*

_____

Graeff,
Leahy,
Wilner, Alan M.
　　(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  October 23, 2018

*This is an unreported opinion, and it may not be cited in any paper, brief, motion, or other document filed in this Court or any other Maryland Court as either precedent within the rule of stare decisis or as persuasive authority.  Md. Rule 1-104.

This appeal concerns a building erected by Friends of Lubavitch, Inc. ("FOL," "Appellant," or "Cross-Appellee") for Rabbi Rivkin and the Chabad-Lubavitch of Towson located at 14 Aigburth Road. FOL is a charitable organization headquartered in Potomac, Maryland, incorporated in 1975 "to aid and support [] activities of the Lubavitch removement in Maryland."[1]

Robin Zoll resides with her family at 16 Aigburth Road, adjacent to 14 Aigburth. Mrs. Zoll is trustee of two revocable trusts that jointly own 16 Aigburth for the benefit of Mrs. Zoll and her children. Aigburth Manor Association of Towson, Inc. (the "Association") is a community association that represents the interests of residents in the Aigburth Manor neighborhood of Towson. Mrs. Zoll and the Association opposed FOL's attempts to expand the single-family home on 14 Aigburth to serve as a religious parsonage and/or community building.

A few months after FOL secured a permit to build a 6,600-square-foot building in front of the then-existing home on 14 Aigburth, Mrs. Zoll and the Association informed FOL that the new building would violate a restrictive covenant running with the land that prohibits dwellings within a certain distance of Aigburth Road. FOL, however, continued to build even though it had only excavated the land by that point. So, 16 days after demanding that FOL stop work, Mrs. Zoll, individually as resident of 16 Aigburth and as trustee and beneficiary of the property's owners, along with the Association ("Appellees"

---

[1] Lubavitch is a 230-year-old Hasidic religious movement that began in Russia. FOL has 27 centers in Maryland known as Chabads (which literally translates to "wisdom, understanding, and knowledge"), including Chabad-Lubavitch of Towson.

or "Cross-Appellants" or "plaintiffs" below) filed suit in the Circuit Court for Baltimore County, seeking a declaratory judgment, injunctive relief, and attorneys' fees. The case eventually proceeded to trial seven months after the plaintiffs filed suit, by which point FOL had already finished construction. The circuit court determined that the building violated the restrictive covenant and ordered that FOL remove it. FOL appealed, and all requests to stay the circuit court's order to raze the building were denied.

FOL challenges the circuit court's decision on three grounds: (1) the court erred by permitting the plaintiffs to amend their initial complaint to correct a misnomer; (2) laches barred their action; and (3) the court erred by ordering removal of the building rather than awarding compensatory damages. In a cross-appeal, Appellees ask us to reverse the circuit court's denial of their request for attorneys' fees.

We shall affirm each of the circuit court's judgments. First, we discern no abuse of discretion in the court's decision to allow the amended complaint because no trial date was scheduled at the time and the corrected misnomer did not prejudice FOL. Next, we conclude that laches does not apply to bar the underlying action because Appellees did not delay unreasonably in filing their suit. Third, it was within the circuit court's discretion to permanently enjoin FOL's willful violation of the restrictive covenants. Therefore, we cannot say the court abused its discretion. Finally, we discern no error in the circuit court striking Appellees' motion for attorneys' fees because no statutory provision authorized the award of attorneys' fees for the underlying action.

_____

## BACKGROUND

### A. The Aigburth Road Properties

The two adjoining properties at the heart of this case—14 & 16 Aigburth Road—were once part of a larger, single parcel of land during the first half of the Twentieth Century. Ms. Mabel S. Collison came to own that single parcel by a deed recorded in 1936. In 1950, Ms. Collison subdivided the parcel and deeded her interest in the portion now known as 14 Aigburth to C. James Velie and Zenith H. Velie and recorded the deed (the "1950 Deed") among the land records of Baltimore County.[2] The 1950 Deed specifies that the property is subject to certain restrictive covenants and restrictions that apply to any dwelling built on the property (at the time there was no structure on 14 Aigburth). The "Setback Covenant" provides that any dwelling erected on the property "shall have a setback equal to one-half of the total set[]backs of the two houses erected on the lots adjoining to the East and West thereof, measured to the centre of said houses, exclusive of porches." These restrictive covenants run with land.

The house on 16 Aigburth, built in 1908, is between 143 and 150 feet from the road and the neighboring house on 12 Aigburth Road is set back between 82 and 86 feet. Averaging the setbacks of 12 & 16 Aigburth, the Setback Covenant requires any structures on 14 Aigburth to be set between 112.5-115 feet from the road.

_____

[2] Ms. Collison subdivided her property into three parcels. She retained 16 Aigburth. The third, 76 Cedar Avenue, was sold in 1950 to a separate buyer, leaving her with only 16 Aigburth. The property at 76 Cedar Ave. is not part of the underlying suit.

3

In 1982, Mrs. Zoll's parents, Mr. James F. Taylor and Madge S. Taylor, purchased 16 Aigburth from the successors in interest of Ms. Collison. Six years later, the Taylors deeded 16 Aigburth to two revocable trusts bearing their names—the James F. Taylor Revocable Trust and the Madge S. Taylor Revocable Trust (the "Revocable Trusts")—for the benefit of their daughter, Mrs. Zoll, and her children. The Zolls have lived there ever since.

FOL purchased 14 Aigburth on September 29, 2008. Although the 2008 deed did not mention the restrictive covenants, the deed incorporated by reference the prior deeds, including the 1950 Deed. The title attorney who conducted closing for FOL in 2008 also prepared a title report that identified the restrictive covenants in the 1950 Deed. Additionally, the title insurance that FOL purchased in 2008 specifically excepted coverage for any issues arising from those restrictive covenants.

The parties do not dispute that the existing house that was built on 14 Aigburth in 1958 is about 115 feet from the road.

## B. FOL's Proposed Addition

Rabbi Manachem Mendel Rivkin lives at 14 Aigburth with his wife and five children. His residency at 14 Aigburth is a form of compensation for his work for FOL. He runs the day-to-day operations of Chabad-Lubavitch of Towson from an office at Towson University that serves the University as well as nearby Goucher College. The existing home at 14 Aigburth (before the proposed addition) was approximately 2,200 square-feet.

4

FOL proposed building an addition to the home at 14 Aigburth because they "had a shortage of space of [Rabbi Rivkin's] family[,]" "a shortage of space for [their] guests[,]" and "didn't have enough space to host people for Friday night dinner."  In January 2012, FOL informed the Association they were considering building an addition to "accommodate worship services for TU students."  In February they learned that at least one neighbor felt "very aggressively negative about it."  Rabbi Rivkin testified at trial that FOL "originally [] proposed to build it as a synagogue[,]" but "[t]he neighbor[s] actually asked us not to do that.  And they asked us to keep it as a residence."

At some point in 2014, FOL held a ceremonial groundbreaking to announce plans "to build an additional space to . . . help enhance . . . religious Jewish life in Towson."  The Zolls and the Association, however, learned about FOL's plan to go ahead with an addition from articles in the *Towson Times* and the *Jewish Times* in the summer of 2014.  Upon learning that FOL planned to go forward with an addition, the Zolls alerted Baltimore County that FOL's use of the property as a religious parsonage violated the applicable zoning laws.  Mr. Zoll and other neighbors requested that FOL produce more detailed plans for the addition.

In the fall of 2014, FOL held a meeting for the community on the front lawn at 14 Aigburth to discuss the addition.  Based on the neighbors' concerns that the proposed building (as shown on plans) looked too commercial and was too tall, FOL asked their architect to "make some aspects . . . feel more residential and more in tune with the neighborhood."  Consequently, FOL lowered the main floor of the proposed building 5 ½-feet further into the ground "so that it wouldn't be as tall."  According to Rabbi Rivkin,

Mr. Zoll also requested that FOL build further forward, as opposed to behind the existing house, so it would be further away from the Zolls' house.

### C. Zoning Hearings

As FOL continued its campaign to build a larger structure on 14 Aigburth, Baltimore County issued FOL a code enforcement correction notice on January 29, 2015. The County ordered, among other things, that FOL "[c]ease the illegal House of Worship/Religious Institution without the benefit of meeting the RTA requirements,[3] the parking requirements and the Non Residential Principle Setback requirements[]" contained in the Baltimore County Zoning Regulations ("BCZR"). The correction notice also ordered that FOL "[c]ease the illegal operation of a Community Building without the benefit of a Special Exception Hearing." The property is 17,122 square feet and zoned D.R.5.5, Density Residential, which permits 5.5 dwelling units per acre. BCZR § 100.1.

FOL responded by petitioning for a special hearing pursuant to BCZR § 500.7 "to confirm continued use of the subject property as a residential parsonage with an accessory use for religious worship and religious education." The Baltimore County Department of Planning recommended that the County's Office of Administrative Hearings ("OAH") deny FOL's petition because FOL "was operating a 'community building,' which would

---

[3] As this Court has explained, in Baltimore County, even permitted uses in a Density Residential ("D.R.") zone must comply with "'dwelling-type and other supplementary use restrictions,'" including those "pertain[ing] to residential transit areas ("RTA"), which are buffer and screening areas. An RTA is a 'one-hundred-foot area, including any public road or public right-of-way, extending from a D.R. zoned tract boundary into the site to be developed.'" *Ware v. People's Counsel for Balt. Cty.*, 223 Md. App. 669, 674 (2015) (quoting BCZR § 1B01.1.B).

require a special exception."  An Administrative Law Judge ("ALJ") ruled that 14 Aigburth

"fails to qualify as a parsonage[,]" and denied FOL's petition on June 26, 2015, explaining:

> While the property is owned by a religious organization, and Rabbi Rivk[i]n is clergy, there is missing from the equation a congregation or parish to which the parsonage would be adjunct.  It is simply not sufficient that the home be owned by a religious organization and lived in by a clergy member and his family.  Rabbi Rivk[i]n testified that he attends service on Saturday mornings at a synagogue on Pimlico Road, which is located 6+ miles from the subject property.  No evidence was presented to establish that Rabbi Rivk[i]n is formally affiliated with or is in charge of that synagogue and congregation.  In these circumstances, the property fails to qualify as a parsonage for the same reasons as those articulated by the Court of Special Appeals in Evangelical Covenant.  *See* also, Ballard v. Balto. Co., 269 Md. 397, 406 (1973) (minister's home qualifies for exemption only if it is a "parsonage for a house of public worship").

Less than six months later, in early 2016, FOL filed another petition for a special

hearing pursuant to BCZR § 500.7, seeking approval to construct "a structural addition to

an existing single family residential dwelling to be used as additional living space for the

family who reside therein."[4]  As the ALJ who presided over the hearing noted in his opinion

and order, several neighbors opposed the petition, arguing that Rabbi Rivkin "is

'disingenuous," and that FOL uses the property for religious purposes, just as FOL

admitted in Case No. 2015-0223-SPH wherein FOL sought (but did not receive) approval

to use the property as a religious parsonage.  Nevertheless, the ALJ approved FOL's

---

[4] The ALJ stated in his written opinion that the "Petitioner propose[d] to construct an addition to the [existing] dwelling, which would bring the total to 4,024 sq. ft."  The record on appeal does not contain a copy of the petition or any additional information to explain the discrepancy between the proposed size of the building as stated in the ALJ's opinion, and the size of the building (6, 614 sq. ft) as shown on the application for a building permit filed two weeks later.  According to Rabbi Rivkin, the foot print for the building in 2016 was the same as proposed in 2014; he testified that apart from the height and some minor interior differences, "[t]he plans have stayed the same."

7

petition on April 6, 2016, observing that, although it was clear that FOL could not use the property as a church, synagogue, or community building under applicable zoning rules, the BCZR "does not contain a restriction on the size of a dwelling in the DR 5.5 zone, provided the setbacks and height limitations are satisfied."  In the order granting FOL's petition, the ALJ specified that the approval was for a "structural addition to an existing single family residential dwelling to be used as additional living space for the family who reside therein[,]" and noted that the relief "shall be subject to the following:"

> Petitioners may apply for necessary permits and/or licenses upon receipt of this Order.  However, Petitioner is hereby made aware that proceeding at this time *is at its own risk* until 30 days from the date hereof[, April 6], during which time an appeal can be filed by any party.  *If for whatever reason this Order is reversed, Petitioner would be required to return the subject property to its original condition.*

(Emphasis added).   The Association appealed the ALJ's decision.[5]

Despite the pending appeal, FOL applied for a permit on April 19, 2016, to build a 6,614 square foot structure (the "Building") attached to the front of the existing home on 14 Aigburth.  The permit application estimated that the Building would cost $550,000 in material and labor.  The Building would roughly quadruple the home's original size (2,200 square-feet) and extend out to between 56 and 57 feet from Aigburth Road.  The Building would be three-stories tall and have four bedrooms, seven bathrooms, five wet bars, a mikvah, and two kitchens, one of which was designed specially to accommodate Rabbi Rivkin's cooking needs for Passover.  The space would accommodate the Chabad's needs

---

[5] Ms. Zoll testified during the trial in this case that the County Board of Appeals had reversed the ALJ's decision following their hearing on March 23, 2017.  The Board's written decision is not in the record on appeal.

on the high holidays at 14 Aigburth, for which Rabbi Rivkin would invite over 200 guests,

with sometimes more than 50 attending dinner.  FOL began construction on June 6, 2016.

### D.  The Setback Covenant

On July 17, 2016, about 40 days after FOL broke ground on the Building, a member

of the local community reached out to Mrs. Zoll to inform her that he looked up the 1950

Deed and discovered the Setback Covenant.  Mrs. Zoll contacted a title attorney who issued

a title report nine days later, on July 26, confirming that the Setback Covenant was binding

on 14 Aigburth and ran with the land.  She then "moved immediately" to notify the

Association that FOL's proposed Building violated the Setback Covenant.[6]  The

Association hand-delivered and emailed a letter to FOL, its attorney, and Rabbi Rivkin the

next day, July 27, stating as follows:

> It has recently come to our attention that the deed to the property for 14 Aigburth Road contains restrictive covenants running with the land.  The covenants, among other restrictions, require[] a building setback of which the current construction is in violation.  Please find the enclosed opinion of title and restrictions [that] evidences the current violations by the owner of 14 Aigburth Road, Friends of Lubavitch, Inc.
>
> The [Assocation] as well as one of the adjoining property owners intend to enforce these covenants and thus request that you issue a stop work order immediately.  If you do not issue a stop work order and construction in violation of the covenants continues, the Friends of Lubavitch continues at its own risk.
>
> This letter serves as notice to all copied parties that the current construction is in violation of the restrictive covenants.  Enforcement of these covenants will require that all nonconforming construction be removed at the expense of the current property owner.

---

[6] Mrs. Zoll testified that she informed the Association because they were already involved in opposing the Building, including the two zoning cases.

— Unreported Opinion —
_____

Excavation on the building had begun in June 2016, and by July 27 when the Association informed FOL of the restrictive covenants in the 1950 Deed, construction of the Building had proceeded only as far as "rough[]" excavation of the front of the property.  After receiving the letter, FOL's attorney confirmed that the 1950 Deed contained the Setback Covenant but, as Rabbi Rivkin would testify at trial, FOL "clearly didn't stop" construction.  When FOL refused to stop construction, Mrs. Zoll hired an attorney to sue FOL to enjoin the construction.

### E.  The Initial Complaint

On August 12, 2016, less than a month after learning of the Setback Covenant and about two weeks after demanding unsuccessfully that FOL stop work, Mrs. Zoll, individually and as trustee of "the Madge and James Taylor Family Trust," along with the Association, filed a complaint for declaratory and injunctive relief in the Circuit Court for Baltimore County.  The plaintiffs asserted that FOL had recently begun constructing the Building in violation of the Setback Covenant despite the Association sending FOL written notice of the violation and demanding that FOL stop work immediately.  They asserted three counts: (1) for declaratory judgment and an order declaring the Building in violation of the Setback Covenant; (2) breach of contract and an order specifically enforcing the restrictive covenants, prohibiting any further construction in violation of the restrictive covenants, and the immediate removal of the Building; (3) injunctive relief, requiring FOL to remove the Building and prohibiting further violation of the Setback Covenant because "obtaining an injunction outweigh[ed] any potential harm that might befall [FOL] if the injunction were granted."  The plaintiffs also sought attorneys' fees.

10

The plaintiffs attached several exhibits to the complaint, including FOL's application for a building permit and affidavits from Mrs. Zoll; David Thurston (an attorney who examined the 1950 Deed); Devin Leary (a registered landscape architect, who assessed the distance of the Building from the street); and Paul Hartman, Vice President of the Association.

FOL filed its answer on September 9, 2016, denying most of the allegations or asserting it lacked sufficient knowledge to answer.[7]   FOL did, however, admit that it received a copy of the Association's letter on July 27, 2016.   In the answer, FOL contended that the Association had "no true interest in the covenants" and, as a homeowners' association, "has no legal standing to enforce covenants to which it is neither a party, nor successor in interest to a party."   Finally, FOL raised three affirmative defenses: that estoppel and laches barred the plaintiffs' claims and that the Association's claims were "ultra vires insofar as it has no authority to sue to enforce covenants."

## F. TRO

Along with their complaint, "[i]n an effort to enforce the covenants and stop construction[,]" the plaintiffs filed a motion for a temporary restraining order ("TRO") and for preliminary injunctive relief.   That day, on August 12, the court heard argument on plaintiffs' requested TRO and denied the motion.   The court reasoned that the affidavits appended to the plaintiffs' motion "fail[ed] to state specific facts from which it clearly appears that immediate, substantial and irreparable harm w[ould] result to Plaintiffs before

---

[7] FOL asserted that it lacked sufficient knowledge as to the truth of the plaintiffs' assertion that the Madge and James Family Trust owned the property at 16 Aigburth.

a full adversary hearing c[ould] be held on the propriety of a preliminary injunction." The court also ordered that the clerk schedule "a hearing on the propriety of issuing a preliminary injunction and hearing on the merits." A scheduling order was issued on September 5, 2016, setting certain deadlines and the trial date for January 10, 2017.

### G. FOL's Motion for Summary Judgment

On December 5, 2016, FOL moved for summary judgment, asserting that the owners of 16 Aigburth are The James F. Taylor Revocable Trust and the Madge S. Taylor Revocable Trust. FOL asserted that because the Revocable Trusts were not parties to the action, all three plaintiffs lacked standing to file suit as none had a property interest in 16 Aigburth. Along with the motion, FOL attached the Association's bylaws as well as a 1988 deed by which James F. Taylor and Madge S. Taylor granted 16 Aigburth to the Revocable Trusts as tenants-in-common.

### H. Motion for Leave to Amend

The plaintiffs responded quickly by filing a motion on December 14, 2016, for leave to amend their complaint to correct a misnomer of the plaintiffs. In their motion, plaintiffs conceded that they misidentified the name of the plaintiff trust, which was actually two trusts. They sought leave to amend their complaint to state as follows:

> Plaintiffs, Robin Taylor Zoll, Individually and as Trustee of the Madge <u>S. Taylor Revocable Trust</u> and James <u>F.</u> Taylor ~~Family~~ <u>Revocable</u> Trust, and Aigburth manor Association of Towson, Inc.

The plaintiffs urged that Maryland Rule 2-341 "states that 'amendments shall be freely allowed' and identifies the correction of a misnomer of a party as a permissible basis for an amendment." Because the amendment was a technical correction and did not introduce

new facts or materially vary the case, the plaintiffs maintained that it would not affect FOL's substantial rights.

In opposition to the request for leave to amend, FOL asserted that plaintiffs' motion was untimely because the scheduling order required the parties to file all motions by December 11, and that granting the motion would greatly prejudice FOL. FOL set out that, in its request for production of documents from the plaintiffs, which it served on September 20, 2016, it had sought "[a]ll documents upon which you base your contention that the 'Madge and James Taylor Family Trust' is the owner of 16 Aigburth[,]" and "[a]ll documents relating to your contention that Plaintiff are third party beneficiaries of the restrictive covenants set forth in the 1950 Deed." FOL pointed out that the plaintiffs agreed to produce all responsive documents but failed to do so.

On December 23, 2016, the plaintiffs filed their opposition to the motion for summary judgment. The plaintiffs admitted that they incorrectly identified the Madge and James Family trust as the owner and, thus, "filed a motion for leave to amend the complaint to correct this misnomer." They asserted that Mrs. Zoll had standing because "she is the beneficiary of the Trusts and, therefore, has a beneficial property interest in the corpus of the Trusts, namely 16 Aigburth Road." Additionally, "as the beneficial owner and resident of the property immediately adjacent of the subject property, she is clearly an obviously an intended beneficiary of the covenant in the deed." As for the Association, the plaintiffs reasoned that, "[b]ecause the Trusts and Mrs. Zoll have standing, the standing *vel non* of the Association is not a basis for its dismissal."

13

Attached to their opposition, the plaintiffs included an affidavit of attorney Michael

N. Schleupner, Jr., who affirmed that "[t]he Trusts are the direct successors in interest to

the grantor of the 1950 Deed."  They also included an affidavit of Mrs. Zoll, in which she

stated that she was trustee and beneficiary of the Revocable Trusts and resides at 16

Aigburth with her husband.

Although the trial was originally scheduled on standby for January 10, 2017, the

case did not proceed that day and the court agreed to postpone the trial because the parties

had an administrative hearing before the County Board of Appeals that same week in the

appeal of the ALJ's April 6 decision to permit FOL to construct the Building.  Therefore,

on February 3, with no trial date set, the court denied FOL's motion for summary judgment

and granted the plaintiffs' motion for leave to file an amended complaint to correct the

misnomer.  The court reasoned as follows:

> Maryland Rule 2-341(a) permits amendment to a pleading without leave of
> the Court by the date set forth in a scheduling order, or no later than thirty
> days before a scheduled trial.  Trial has not yet been scheduled in this matter.
> If in fact the Scheduling Order in this case does control—and, this Court does
> not believe that it does—Plaintiffs are still permitted to amend their
> Complaint, as amendments shall be freely allowed.  *See* Md. Rule 2-341(c).

The court issued a new scheduling order on February 21, 2017, ordering that "to the

extent there is any conflict, the schedule established below shall supersede that established

by any prior Scheduling Order[.]"

## I.  Trial

The case proceeded to trial as planned on March 30 and 31, 2017.  The plaintiffs

called Mr. Michael Schleupner as an expert in "title searches, title examinations, covenants

and restrictions and land documents," and Mr. Bruce Doak as an expert in "surveying and measuring setbacks." FOL called Mr. Scott Dallas as an expert in surveying. In addition to expert testimony, the court heard testimony from the Zolls; Rabbi Rivkin; Rabbi Shmuel Kaplan, the president of FOL; Mr. Hartman from the Association; and Ms. Robin Clark, a supervisor of inspections for Baltimore County Code Enforcement.

Mrs. Zoll testified to the impact the Building has had on her and her family's use and enjoyment of their property. She explained that the Building severely blocks the view in front of their home and has devalued their property by five percent. She insisted that the decreased value "[wa]s really the least of it"; and relayed that she and her husband "feel really violated by [FOL] coming in and putting [the] Chabad house on the property violating the zoning laws and violating this covenant[.]" Despite Aigburth Road's proximity to Towson University, Mrs. Zoll described her neighborhood as "a lovely, quiet [] residential enclave" with old homes "setback from the road in [a] very distinctive kind of way. Old trees. Um, and it was peaceful. Hard to be peaceful that close to Towson, but it was." She explained that her house had a large front porch and that her and her husband's "favorite thing to do is to sit on that porch in the mornings and talk to each other and read the paper and have coffee, and we call it our favorite room in the house." Their view is now "a big brick wall instead of trees and a breeze and the late afternoon sun[,]" and "there's this wall with all the pipes hanging out in our direction." This caused the Zolls to spend "thousands of dollars" to install trees to "try to block it, [] so we wouldn't have to see it." But she described the trees as "a pitiful attempt when you're [] working with a three-story brick building, so you can't block it. We have no choice but to look at it." She

concluded, "I don't know what value to put on the use and enjoyment of this property. I

would say priceless, I don't know. But it's – it's really, really been devastating to us."

Rabbi Rivkin testified that he did not learn of the restrictive covenants until July

2016. Had he known prior, he testified that FOL

> would have come to court to determine what it meant or we would
> have gotten them to sign off on what they thought it meant, and we would
> have built either behind [] our house, . . . or we would have built it in such a
> way that it still maintained the setback[] however[] they deemed it to be.
>                                    * * *
> So I probably would have sat down with them and said, listen, these
> are my options, how do you want me to do it best, which is kind of what I
> did already. It's just I probably would have gotten it – I probably would have
> made them sign off on something.

Rabbi Rivkin confirmed, however, that FOL "did not stop construction" upon

learning of the restrictive covenants. When asked why not, he replied that it was because

of

> the financial challenges that stopping to build smack in the middle of
> construction would have caused. At that point we had an apartment that we
> had leased for two months and [] we actually had to move out by August 1st.
> So we would have not had [any]where t[o] live.
>        The lumber was already delivered, and if I would have pulled out of
> the contract, from what I understand our builder . . . would have – we – we
> probably would have saved about of the $800,000 or somewhat that it cost
> to build, we would have saved about $200,000.
>                                    * * *
> It basically became a choice of, do we stop because maybe this
> covenant means something and lose $600,000 or do we go ahead and build
> and – []– and assume that what we think is is.

After explaining that he and his family "needed to move back into the house" by August

25, Rabbi Rivkin continued:

> The construction at that point *was substantially behind schedule* and
> I was pressing them aggressively, uh, because we needed to move back in.

16

We were having a baby.  We had a baby in September – no, in October, the beginning of October.  And, um, and, um, my wife wanted to be back in our house before October, which means we needed to get our water and our power.

And the lumber was sitting out there, so they continued to build, and they got us under roof by the end of July, I think, uh, which was about when they . . . went for a TRO which, honestly, made us very scared.
We were – we were actually hopefuly that [] the judge might grant it because that would have allowed us to have certainty, but the judge denied their TRO.
. . .
And . . . and we continued to build.  We kind of didn't have a choice it was like we were on the highway there was no way off.

As for the possibility that the court order FOL to remove the Building, Rabbi Rivkin testified that it "would be catastrophic to us and our family[.]"  He elaborated on cross-examination that, even though he did not own the property, living there was his benefit and he, personally, contributed "[s]ubstantially" for the Building in cash.

Following the conclusion of FOL's case, the plaintiffs re-opened their case on rebuttal.  They offered further testimony, including that of Mr. Zoll.  He testified in large part to the process preceding the construction.  According to Mr. Zoll, from the summer of 2014 when the process began, FOL would consult with the community and say they would make changes but then go silent and the neighbors wouldn't hear back from them "for weeks or months[,]" and then there'd be no changes to the plans.

Further, Mr. Paul Hartman, from the Association, testified to the character of the neighborhood as well and that, "the entire scope of the project, which was huge" was not immediately known to the Association when FOL consulted with them in 2014.  And, "as it turned out[,] the community and the association had objections to [] the size, the bulk,

the architecture of [] the project."  The parties then offered closing arguments and the court took the matter under advisement.

### J.  Memorandum Opinion and Order

The circuit court issued a memorandum opinion and an order on April 13, 2017.  In her 20-page opinion, the trial judge set out all the material evidence the parties presented, summarized the testimony of witnesses, and assessed their credibility.  **E. 220-27.** Importantly, the court found Mrs. Zoll to be a credible witness and Rabbi Rivkin to be "evasive and aggressive during questioning."  The judge therefore credited Mrs. Zoll's testimony whenever it differed from that of Rabbi Rivkin.

*The Setback Covenant*

The court ruled that "[t]he evidence was undisputed that the 1950 deed imposed the restrictive covenants, including the Setback Covenant, on 14 Aigburth Road."  "[B]ased on the language used in the deed," the judge found, "the restrictive covenants run with the land."  She explained: "The plain meaning of the Setback Covenant refers to a front setback measured from the front property line to the center of the front plane of the house on the property, exclusive of the porch.  This meaning is the only reasonable interpretation of the Setback Covenant."

The court found that Mrs. Zoll, individually and as trustee of the Revocable Trusts (collectively, the "Zoll Plaintiffs"), had "standing to enforce the Setback Covenant as the resident and owner of 16 Aigburth Road."  The court noted, however, that the plaintiffs failed to adduce evidence that the Association had standing to enforce the Setback Covenant.  Nevertheless, she explained that the issue was moot "because the Zoll Plaintiffs

are entitled to the relief requested by all Plaintiffs[,] and "because the Zoll Plaintiffs have standing and they asserted the same claims and sought the same relief as the Association."

Although the judge reasoned that constructive notice, as opposed to actual knowledge, is sufficient to make restrictive covenants enforceable against "all persons dealing with the property," she found that FOL had actual notice of the restrictive covenants.  She charged FOL with actual notice as of 2008 when it purchased 14 Aigburth based on the title search conducted at that time, and the fact that its "title insurance policy included an exception to coverage for the 1950 restrictive covenants."

*Declaratory Judgment*

The court reiterated that Mrs. Zoll, individually and as trustee, had an interest in the Setback Covenant sufficient to pursue the declaratory judgment because her enjoyment of her property, the property next door to the restricted property, had been impaired by violation of the Setback Covenant.  She also found that "[t]he Association has an interest in the Setback Covenant because they own properties near the restricted property; and, the enjoyment of their properties has been impaired by [FOL's] violation of the setback covenant."  The court determined that "[e]nforcement of the Setback Covenant is necessary to maintain the integrity of the neighborhood[,]" and that a "declaratory judgment would serve to terminate the controversy giving rise to the proceedings because the parties would have their rights determined under the Setback Covenant."  Additionally, the court found that an actual controversy existed as exhibited by FOL's assertion that the Setback Covenant was ambiguous and unenforceable, and that the plaintiffs "waited too long to attempt to enforce the Setback Covenant."  Based on this, the court entered an order

granting the plaintiffs' request for declaratory judgment, ordering that the Setback

Covenant "is valid and in full force and effect[,]" and found the Building to be in violation

of the Setback Covenant.

## *Laches*

The court rejected FOL's argument that laches barred the plaintiffs' claims.   It

expounded that to invoke the defense of laches successfully, FOL had to show both "an

undue lapse of time" and "some disadvantage or prejudice[.]"   First, the court concluded

that "[t]here was no undue delay on the part of Plaintiffs[,]" reasoning that "[t]he evidence

demonstrates that Plaintiffs acted quickly once they discovered the existence of the Setback

Covenant and learned that the covenant runs with the land."   Second, the court found no

disadvantage to FOL, finding instead that FOL proceeded with construction in the face of

"widespread opposition from the community[.]"   Even after July 2016, the point at which

Rabbi Rivkin admitted that FOL had actual notice of the Setback Covenant, the court found

that FOL "chose to proceed with the construction."   Thus, the court concluded, FOL

"assumed the risk of the harm [FOL] now faces for violating the Setback Covenant."[8]

## *Breach of Contract*

Next, the court found that FOL "breached the Setback Covenant," to which Mrs.

Zoll, individually and as trustee, was beneficiary.  The court reasoned as follows:

---

[8] The court also rejected FOL's arguments that (1) the plaintiffs abandoned their right to enforce the Setback Covenant by selecting to enforce only one of the four restrictive covenants contained in the 1950 deed, and (2) the plaintiffs should be estopped from enforcing the Setback Covenant because they did not bring forth this argument at the same time the plaintiffs challenged FOL's Building through the administrative zoning processes. FOL does not assert either of these arguments on appeal.

> [T]he Setback Covenant was imposed by the 1950 deed, which is in the Zoll Plaintiffs' direct chain of title. The Setback Covenant runs with the land and is binding on Defendant, as owner of 14 Aigburth Road, today. Based on the plain meaning of the Setback Covenant, the evidence demonstrates that the [Building], which has a front setback of 56 feet to the west and 57 feet to the east, violates the Setback Covenant (which requires a setback of 114.5 feet according to [FOL's expert,] Mr. Dallas's measurements and 115 feet according to [the plaintiffs' expert,] Mr. Roak's measurements).

*Injunctive Relief*

The court then granted the plaintiffs injunctive relief. Appling the four factors for injunctive relief that the Court of Appeals set out in *State Commission on Human Relations v. Talbot County Detention Center*, 370 Md. 115, 136 (2002), the court began with the plaintiffs' likelihood of success on the merits and observed that it already found that FOL violated the Setback Covenant. The court proceeded to the second factor by comparing the hardship on the parties by granting or refusing an injunction. The judge observed that FOL made "no innocent mistakes," and looked to the harm FOL caused the plaintiffs, findings as follows:

> [T]he view from the front porch of 16 Aigburth Road is now a large brick wall, rather than the breeze, trees, and sun Robin Zoll used to enjoy. Ms. Zoll testified that the enjoyment of her property is priceless; and, Defendant's construction of the [Building], in violation of the Setback Covenant, has been devastating. Paul Hartman testified that the [Building] does not fit in with the neighborhood. Enforcing the Setback Covenant would assist with maintaining the integrity of the neighborhood.
>
> The financial harm to the Zoll plaintiffs is that their property value has decreased by five percent due solely to the [Building] constructed on 14 Aigburth Road. This represents a loss of value of $17,075. Paul Hartman testified that he is concerned that it would be difficult to sell the property at 14 Aigburth Road in the future, due to its appearance and because the [Building] does not fit in with the neighborhood. Mr. Hartman testified that a similar, large structure in the area sat vacant on the market for approximately two years before it was sold. Mr. Hartman said that properties not selling quickly is harmful to the property values in the neighborhood.

21

_____

Comparatively, the court found the following regarding FOL's harm:

> [FOL] argued that removing the [Building] would be financially
> devastating.  However, [FOL] did not present any specific evidence about
> the monetary loss [it] would suffer from moving the [Building] or tearing it
> down.  Also, Rabbi Rivkin's testimony about the funding of the construction
> of the [Building] was evasive and not credible.  Thus, the Court does not give
> weight to the alleged monetary harm to Defendant.

Next, the court determined that the injury to the plaintiffs would be irreparable
absent an injunction because Mrs. Zoll "testified credibly that her enjoyment of her
property at 16 Aigburth is priceless; and, the construction of the [Building] was
devastating"—her "view is a brick wall."   Additionally, the court highlighted the
Association's interest in maintaining the neighborhood's integrity and found that "the
Association [wa]s also harmed by [FOL]'s violation of the Setback Covenant; and, the
harm to Plaintiffs is not merely pecuniary in nature."

The court ordered FOL to "remove the Building and all other improvements that
violate the Setback Covenant no later than March 1, 2018," and enjoined FOL "from
constructing any structure or other improvement that violates the Setback Covenant."

FOL noted its timely appeal on May 4, 2017.  The next day, Appellees noted their
cross-appeal on the issue of attorneys' fees.  On February 28—just one day before the
Building was to be removed—FOL filed a Motion to Extend and/or Stay Enforcement of
the order, which the circuit court denied on March 2.  On April 10, 2018, FOL filed a
motion asking this Court to stay the enforcement of the circuit court's order, which was
denied on April 24.

This appeal requires us to consider three issues raised by FOL and a fourth that Appellants present in their cross-appeal:

I. "Whether the circuit court abused its discretion when it granted Plaintiffs' motion to amend the Complaint in order to substitute parties with standing for those without standing instead of granting FOL's motion for summary judgment filed against the originally named plaintiffs?"

II. "Whether Plaintiffs' claims were barred by laches when Plaintiffs themselves were on notice of the deed restriction and Plaintiffs had actual knowledge of and had litigated against FOL's plans to construct an addition in front of the existing house for more than two years prior to construction?"

III. "Whether the circuit court erred in ordering specific enforcement of the covenant when there was evidence of an adequate remedy in damages?"

IV. "Whether the [c]ircuit [c]ourt erred in striking Appellants' claims for attorney's fees?"

## DISCUSSION

## I.

## Motion to Amend the Complaint

FOL asserts that the circuit court erred as a matter of law by granting Appellants' motion for leave to amend their complaint rather than granting FOL's motion for summary judgment. According to FOL, the three plaintiffs that filed the initial complaint (Mrs. Zoll, the Madge and James Taylor Family Trust, and the Association) lacked standing to enforce the covenants. FOL raised this issue in its answer and, during discovery, it questioned the fee owner of 16 Aigburth. This, FOL suggests, put Appellees "on notice of *their* need to reexamine the proper party status of the named Plaintiffs[,]" and the court should not have "afforded [them] the opportunity to resuscitate their case at such a late date." Given that

the plaintiffs sought to amend their complaint within 30 days of the scheduled trial, FOL asserts that the court should have denied the motion because it was prejudicial.

FOL characterizes the proposed amendment as "much more" than the mere correction of a misnomer, and contends that the amendment added two new plaintiffs to the prejudice of FOL.  FOL asserts that it was entitled to rely on the plaintiffs' affirmation that they had standing.  Had Appellees timely named these plaintiffs, "FOL would have taken a different tack in discovery and strategy generally[,]" including "reassess[ing] its risk and forego[ing] further construction of the addition[,]" and "FOL also would have further pressed in discovery disclosure[.]"  FOL concludes that "the circuit court abused its discretion in failing to recognize and protect FOL against the prejudice that inured by permitting the late-filed and substantive amendment, which dramatically altered the complexion of the case."

Appellees respond that the court's ruling was not an abuse of discretion because the amendment was "a purely technical, if not grammatical, correction of [a] misnomer."  They point out the similar naming between the mistakenly identified "Madge and James Taylor Family Trust,"—which does not even exist—and the properly identified  "Madge S. Taylor Revocable Trust" and "James F. Taylor Revocable Trust."  Although the motion for leave to amend came only 27 days before the originally scheduled trial, Mrs. Zoll asserts that Maryland Rule 2-341(a) permits the court to grant her leave to correct a misnomer.  Further, they continue, FOL was "afforded more than the 30-day's notice contemplated by Rule 2-431(a) because the trial was postponed over two months *after* she sought leave to amend."  Appellees also refute that FOL suffered any prejudice, saying that "FOL's contention that

it would have taken a 'different tack' in discovery is hardly credible[,]" unexplained, and belied by the fact that "FOL did not take a 'different tack' once the Trusts were added[.]"

In their reply brief, FOL argues essentially that the circuit court's order was prejudicial because it began and completed construction of the Building between the time Appellees filed their initial complaint and the time Appellees amended their complaint. We hold that it was well within the court's discretion to permit the amendment.

In an appeal challenging a trial court's decision to allow a party leave to amend, this Court reviews for abuse of discretion. *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443-44 (2002) (citations omitted); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 248 (1996). Maryland Rule 2-341 governs the amendment of pleadings. It provides that a party "may seek to . . . (4) correct misnomer of a party, . . . (6) add a party or parties, [or] (7) make any other appropriate change." Md. Rule 2-341(c). A party may amend its pleadings *without leave of court* "by the date set forth in the scheduling order or, if there is no scheduling order, no later than 30 days before a scheduled trial date." Md. Rule 2-341(a). But if that time has elapsed, the party may seek leave of court to amend its pleadings. Md. Rule 2-341(b). The circuit court shall allow amendments "freely . . . when justice so permits." Md. Rule 2-341(c).

The plaintiffs below sought leave of court to amend their complaint to correct a misnomer of the plaintiff trust(s) on December 14, 2016. Seeking leave to amend was appropriate, at the time of the plaintiffs' motion, because the scheduling order at the time set trial for January 10, 2016. As the plaintiffs noted correctly, a correction of a misnomer within 30 days before trial was only permissible with leave of court under Rule 2-341(c).

Before the trial court in this case ruled on the plaintiffs' motion, however, the parties

consented to postpone the trial indefinitely.   On February 3, 2017, the trial court granted

the plaintiffs leave to amend their complaint.   The court reasoned that the plaintiffs did not

actually require leave of court because there was no trial set at that time, and, even if the

old scheduling order were still to be deemed in effect for purposes of the motion, it would

permit the plaintiffs leave of court because "[a]mendments shall be freely allowed" under

Rule 2-341(c).

　　　We discern no abuse of discretion in the trial court's decision.   We have before us a

classic misnomer—the plaintiffs misidentified the property owner as a single entity instead

of two entities that were joint owners.   The Revocable Trusts had virtually the same names

as the non-existent single trust that the plaintiffs originally named as the owner.   As we just

explained, Rule 2-341 permits amendment to correct misnomers.   And even if plaintiffs'

amendment amounted to "add[ing] two additional named Plaintiffs[,] as FOL urges,

Maryland Rule 2-341(c)(6) lists "add a party or parties" as a permissible amendment.

　　　We also agree with the trial court's observation that the plaintiffs were free to amend

their complaint without leave of court because there was no trial scheduled after the parties

agreed to postpone the trial date.[9]   Certainly the chronology of the pleadings and deadlines

under the scheduling orders demonstrate that FOL was not prejudiced by the amendment.

The plaintiffs identified the Revocable Trusts as the owners of 16 Aigburth in their motion

---

[9] The court eventually issued a new, superseding scheduling order on February 21, 2017, and rescheduled trial for March 30, 2017—nearly two months after the date on which it permitted the plaintiffs to amend their complaint.

for leave to amend on December 14, 2016—only three days after the deadline that the original scheduling order set for amendments without leave of court.  Given the parties' consent motion to postpone the original January trial date, however, the case did not proceed to trial for over three months after the plaintiffs sought to substitute the Revocable Trusts as plaintiffs.  Rule 2-341, permitting parties to amend pleadings without leave of court prior to 30 days before trial, suggests that a party-opponent is unlikely to suffer prejudice from a pleading amended more than 30 days from trial.

Moreover, we note that FOL conceded before the trial court that Mrs. Zoll had standing.  When the trial court pressed FOL on whether Mrs. Zoll, individually, was entitled to relief, though, FOL replied: "That's correct, your Honor.  If [] anybody is it would be her or the Trust[s] themselves."  The circuit court then ruled that Mrs. Zoll had standing in her individual capacity "to enforce the Setback Covenant as the resident and owner of 16 Aigburth Road."  In addition to conceding the issue at trial, FOL failed to challenge in its Questions Presented before this Court the circuit court's ruling regarding Mrs. Zoll's individual standing.  Accordingly, FOL forfeited any challenge to Mrs. Zoll's standing on appeal.  *See Peterson v. Evapco, Inc.*, 238 Md. App. 1, 62 (2018) (holding that parties forfeit issues for appellate review that they fail to include in their "Questions Presented").  Therefore, because Mrs. Zoll had standing to pursue the underlying action against FOL regardless of whether the court permitted the plaintiffs to correct their misnomer of the Revocable Trusts, FOL incurred no prejudice by the circuit court granting the leave to amend.  *See, e.g.*, *Bd. of License Comm'rs for Montgomery Cty. v. Haberlin*, 320 Md. 399, 404 (1990) ("Where there exists a party having standing to bring an action

or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing.") (citations omitted).

Finally, FOL's behavior following the plaintiffs' motion to amend belies its assertion on appeal that it would have changed course had the plaintiffs named the proper owner of 16 Aigburth. FOL was on actual notice of the restrictive covenants as well as the strong neighborhood opposition to the Building *before* the plaintiffs filed their complaint on August 12, 2016. Despite this actual knowledge that the Setback Covenant restricted construction on 14 Aigburth, Rabbi Rivkin testified that FOL decided to "go ahead and build" anyway. Two weeks after the plaintiffs filed suit, on August 25, construction of the Building "was substantially behind schedule," but rather than stall the process, Rabbi Rivkin testified that he "press[ed] [the builders] aggressively" to speed up construction. Two more weeks would pass before FOL filed its answer to the plaintiffs' complaint, in which FOL asserted that it lacked sufficient knowledge to form a belief as to whether the Madge and James Family Trust owned 16 Aigburth. In other words, before FOL discovered that the true owners of 16 Aigburth were not plaintiffs to the underlying action, it chose to "go ahead and build" and to do so "aggressively." FOL did so at its own risk.

## II.

## Laches

Although FOL admits it "did not share its architectural plans with Appellees prior to the spring of 2014," it contends that laches should bar Appellees' action because they "clearly had knowledge of FOL's expansion plans as early as 2012." FOL claims that given Appellees' years of opposition, enforcement of the Setback Covenant "now at this

late hour as both a sword and a shield . . . is the height of inequity."  FOL asserts that it

suffered undue prejudice and the court should have barred Appellees' action because

Appellees "wait[ed] to raise the issue until after the county administrative process was

concluded, after the building permit was issued, and after FOL's construction was

underway."

In response, Appellees maintain that they "acted 'promptly' and 'quickly' in seeking

to enforce the Setback Covenant."  Setting out the timeline, Appellees say that Mrs. Zoll

learned of the Setback Covenant on July 26, 2016, the Association hand-delivered a letter

to Rabbi Rivkin and his attorney the next day, and Appellees filed suit 16 days later when

FOL did not cease construction.  Besides, Appellees continue, delay alone is insufficient

to support the application of laches because, as the circuit court found, FOL suffered no

prejudice given that it was on actual notice of the Setback Covenant and the community

opposition but chose to proceed with construction anyway.  And even if the deed may have

put Appellees on constructive notice, they contend that laches would not apply to bar their

action until they actually discovered the Setback Covenant and failed to enforce it.  Finally,

Appellees say that FOL mischaracterizes the length of time they "slept on their rights" by

conflating Appellees' more general opposition to FOL building the Building with how long

it took Appellees to enforce the Setback Covenant once they learned of it.

Maryland courts may apply the doctrine of laches to bar a plaintiff's otherwise

timely claim if there has been an "unreasonable delay in the assertion of one's rights and

that delay results in prejudice to the opposing party."  *Liddy v. Lamone*, 398 Md. 233, 244

(2007) (citing *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 117 (2000)).

"There is no firm time limit for laches: rather a judge sitting in equity considers plaintiff's delay in asserting the claim and its causes and weighs that against the prejudice to the defendant caused by the late assertion of the equitable claim." *Murray v. Midland Funding, LLC*, 233 Md. App. 254, 260 (2017). We review *de novo* the circuit court's determination that laches did not apply. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 585 (2014). In doing so, we look to the well-pleaded facts in Appellees' complaint to determine whether any delay in filing was unreasonable and prejudicial to FOL. *Id.*

### The Reasonableness of Appellees' Delay in Filing

We determine that the first factor—the reasonableness of delaying suit—is dispositive here. The Court of Appeals has instructed:

> There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case. The passage of time, alone, does not constitute laches but is simply 'one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made.

*Id.* at 590 (internal citations omitted). To assess the reasonableness of a delay, "we must analyze (i) when, if ever, the claim became ripe (*i.e.*, the earliest time at which Appellees were able to bring their claims); and (ii) whether the passage of time between then and when the Appellees filed the complaint was unreasonable." *Id.* The claim is ripe when "the point of controversy became substantially certain." *Id.* at 600.

In *State Center*, the main case on which FOL relies, the plaintiffs brought three groups of claims concerning a public Request For Qualifications ("RFQ") that the State issued "to solicit a 'Master Developer' who would be granted the exclusive right to negotiate with the State to execute" the State Center Project. *Id.* at 473-74. Those claims

30

— Unreported Opinion —

───────────────────────────────────────────────

were, essentially, (1) those arising out of the process for selecting the Master Developer, which was announced in March 2006; (2) those concerning the nature of the project, the contracts for which were authorized in June 2009; and (3) challenges to the "First Amendment" to the Master Development Agreement ("MDA"), which was authorized in July 2010. *Id.* at 600-03. The plaintiffs did not file suit until December 17, 2010. *Id.* at 606. Looking at the varying lengths of delay from the points in time when the plaintiffs' different controversies became ripe, the Court of Appeals held that laches barred the entire action. *Id.* at 607.

The Court explained that, "[a]lthough there is no bright-line rule" for laches, the doctrine is intertwined with statutes of limitation and courts should look to the limitations period for an analogous action at law. *Id.* at 603-04. Regarding the first group of the plaintiffs' claims, the Court observed that, even under a "generous analogy to the three-year statute of limitations," those claims would be barred and were thus barred by laches. *Id.* at 605-06. Looking to the second and third groups, which concerned "time-sensitive procurement issues," the Court declined to apply a strict analogy to the seven-day limits that would have applied under the statutes applicable to those actions, but concluded nonetheless that the 18-month and five-month delays were "unreasonable and unjustified." *Id.* at 606-07. The Court noted, however, that the plaintiffs' motivation in bringing suit "appear[ed] to be a 'desire to stave off competition[,]'" and reasoned that their third group of claims should not be allowed to save their action: "If the First Amendment's 'material' changes, which were approved and executed in September 2010, were the first stage of the alleged violations, we might be more likely to find reasonable the short time period

31

between September 2010 and December 2010." *Id.* at 608.  But because "[e]quity is not limited . . . to such a tunneled vision of circumstances[,]" the Court was "permitted to weigh all the facts[,]" including the parties' motivations.  *Id.*

In *Inlet Associates*, by contrast, the Court declined to apply laches.  *Inlet Assocs. v. Assateague House Condominium Ass'n*, 313 Md. 413 (1988).   *Inlet Associates* also involved some neighbors who opposed new construction near their properties.  *Id.* at 422-23.  Inlet sought to construct a hotel and marina complex in Ocean City on a piece of property for which it had obtained an option to purchase.  *Id.* at 417-18.  Inlet first appeared at a public work session of the City Council on August 28, 1985, and proposed to provide various public amenities if the City would "trade" it a 25-foot strip of land and riparian rights.  *Id.* at 418.  It then presented its plan at a regular session of the City Council on September 2, 1985, and the Council approved the plan at a public meeting on October 21. *Id.* at 418-20.  The City Solicitor sent a letter to Inlet on December 19 formalizing the arrangement.  *Id.* at 420.  Following this favorable decision, Inlet exercised its option to purchase the property on which it would build; spent between $1 million and $2 million on development plans; and obtained sit plan approval, permitting, and a height variance—all without any opposition.  *Id.*

The following September, Inlet returned to obtain an amendment to allow for the construction of a restaurant, which the Council approved on October 6, 1986, at a public meeting.  *Id.* at 421.  At that meeting, for the first time, "the question arose" whether the City could dispose of its property interests by resolution instead of an ordinance, but the City Solicitor advised the Council that a resolution sufficed.  *Id.*  Following that meeting,

the City Solicitor prepared an "Agreement and Declaration of Covenants, Conditions, and Restrictions" between Inlet and the City. *Id.* On November 19, 1986, various individual taxpayers and property owners, most of whom lived nearby the property, sued to enjoin the contract's execution, arguing that the City acted *ultra vires* and that an ordinance was required. *Id.* at 422. After intervening as a defendant, Inlet argued, in part, that laches barred the plaintiffs' action. The circuit court allowed the plaintiffs to proceed and ultimately ruled that "the Ocean City Charter required an ordinance, rather than a resolution, to transfer the property interests in question[.]" *Id.* at 423-24.

The Court of Appeals agreed, emphasizing the trial court's findings that "the City Council did not place its final imprimatur on the Inlet proposal, which as amended included the restaurant in place of the shops on the pier, until October 6, 1986[,]" and that the plaintiffs sued approximately one month later. *Id.* at 439. This fact was material because part of the opposition by some plaintiffs was due to "the late inclusion of the restaurant and its location in the Inlet proposal." *Id.* The Court also noted "that until the summer of 1986, Inlet had not received the necessary permits and authorizations to permit it to proceed to implement its proposed plan." *Id.* Thus, the Court concluded, "Plaintiffs' suit in November of 1986 was hardly a delay befitting a serious claim of laches." *Id.*; *see also Fraternal Order of Police v. Montgomery Cty.*, 446 Md. 490, 507-10 (2016) (holding that laches did not bar the claims that the plaintiffs brought the day prior to an election, one-and-a-half months after they had accrued, given the time it takes a court to schedule and hold a trial and the fact that the plaintiffs sought only monetary damages and to enjoin future conduct).

According to the foregoing decisional law, in order to determine whether the Appellees' delay in filing the underlying action was unreasonable, we must first analyze when their claim arose. *State Center*, 438 Md. at 600.  FOL attempts to expand the time period relevant to Appellees' delay by including Appellees' prior opposition to the plans announced in 2014 and in the zoning case involving the proposed use of 14 Aigburth as a residential parsonage with an accessory use for religious worship and religious education. But as FOL points out elsewhere in its briefing, "this case is not about whether [FOL] was, is, or will in the future use the addition as a house of worship in contravention of local zoning law."  Appellees' action for declaratory judgment and injunctive relief concerned solely whether the Building violated the Setback Covenant.

In this case, an ALJ held a hearing in March 2016 to consider FOL's petition to build an addition at 14 Aigburth.  On April 6, 2016, the ALJ issued its opinion authorizing FOL's construction, and FOL applied for its building permit on April 19.  As the Court did in *Inlet*, we will consider FOL's obtainment of the necessary permitting and approval as the operable date from which to measure the plaintiffs' delay.  *See* 313 Md. at 439. Counting from April 19, only about three months had passed until July 27 when the Association hand-delivered and emailed FOL a letter asserting the restrictive covenants and demanding that FOL stop work on the Building.  By this point, FOL had only excavated the ground and had not yet begun construction.  When FOL proceeded with construction, Appellees waited only 16 more days before filing suit in circuit court, seeking not only a permanent injunction but a TRO to stop FOL's work on the Building.  This was "hardly a delay befitting a serious claim of laches." *Inlet*, 313 Md. at 439.

Because equity allows us to look at the facts as a whole to assess the parties' behavior, *see State Ctr.*, 438 Md. at 608, we also consider relevant the fact that the plaintiffs were not simply sleeping on their rights.  In fact, only 10 days passed between when Mrs. Zoll received actual knowledge of the restrictive covenants on July 17, and when the Association sent its July 27 letter.  Mrs. Zoll spent the meantime contacting her attorney to confirm that the covenants were binding and ran with the land.  Appellees here, unlike those in *State Center*, were not taking a "wait and see" approach.  Rather, they acted quickly and cannot be said to have delayed suit unreasonably.  Accordingly, we affirm the circuit court's decision that laches did not apply.

## III.

### The Remedy

Finally, FOL argues that the court should have awarded the plaintiffs compensatory damages rather than specific performance because it "had abundant evidence before it of the actual damage that ostensibly arose as a result of the construction of the addition within the set-back area[,]" including testimony that the property value of 16 Aigburth diminished by $17,075 and Mrs. Zoll spent thousands of dollars on trees and landscaping.  According to FOL, Mrs. Zoll's testimony that the loss was "devastating" is "hyperbole, not fact[,]" and that the addition hasn't precluded her use of 16 Aigburth—only "her enjoyment of her morning coffee taken on her porch has been diminished as a consequence."  FOL says that the circuit court failed to weigh these damages against the burden that complying with the injunction would impose on FOL.  Although the court was within its discretion to discredit Rabbi Rivkin's testimony about the construction funding, FOL insists that the court abused

35

its discretion by "ignor[ing] all of the other evidence regarding FOL's burden of compliance[,]" including that the addition was a three-story brick structure that, as estimated in FOL's application for a building permit, would cost $550,000 to build.

FOL attempts to distinguish the facts of this case from other Maryland cases in which our courts have specifically enforced restrictive covenants. For instance, FOL suggests that the Court of Appeals' decision in *Eisenstadt v. Barron*, 252 Md. 358 (1969), is distinguishable because, "unlike the defendant here, Eisenstadt both started and completed installation of the pipeline during litigation and with actual, not constructive, notice of the deed restriction." FOL also attempts to distinguish *Chestnut Real Estate Partnership v. Huber*, 148 Md. App. 190 (2002), because it was undisputed in that case that the defendant had actual knowledge of the restrictions before beginning construction. The commonality between *Eisenstadt* and *Huber*, FOL suggests, was the Courts' determinations in each case "that the defendant [] had been a willful violator of the covenant and that an order compelling removal would be a just punishment for that behavior." Yet, in this case, FOL maintains, it had already begun construction before the suit was filed and "should not be penalized in equity" for Appellees' failure to pursue their motion for a preliminary injunction.

Appellees explain in response that, "[b]ecause a permanent injunction to enforce a restrictive covenant is like a request for specific performance, the rule requiring a showing of irreparable harm does not apply." Thus, Appellees continue, removal of the Building was an appropriate remedy for FOL's violation of the Setback Covenant and the circuit court was within its discretion award such relief. Although FOL attempts to distinguish

cases like *Eisenstadt* and *Huber* that involve "a willful violator of a covenant," Appellees

charge "that FOL and Rabbi Rivkin were willful violators of the Setback Covenant."

Additionally, Appellees contend that the doctrine of comparative hardship is

inapplicable here because comparative hardship applies "only when the violation is

committed *innocently or mistakenly*." (Emphasis in Appellees' brief). Moreover, they

assert, enforcing the covenant did not impose significantly greater harm on FOL because

the costs that the Building caused Appellees were not slight. Appellees insist that the

circuit court found correctly that FOL's choice to continue with construction was not an

innocent mistake. Even so, Appellees suggest that the circuit court *did* compare the relative

hardships of the parties, finding that Appellees suffered (1) decreased value in the property;

(2) impairment of their use and enjoyment of the property; (3) impairment in the integrity

of the neighborhood; and (4) an impact on the value of other properties in the

neighborhood—as compared to Rabbi Ravkin's "evasive and not credible" testimony that

stopping construction would have cost him $600,000. Accordingly, Appellees conclude,

"FOL clearly failed to demonstrate that the harm it would suffer was 'greatly

disproportionate' to the harm suffered by [Appellees]."

The Court of Appeals has explained that "[a]n injunction is 'a writ framed according

to the circumstances of the case commanding an act which the court regards as essential to

justice, or restraining an act which it esteems contrary to equity and good conscience.'" *El

Bey v. Moorish Science Temple of Am., Inc.*, 362 Md. 339, 353 (2001) (citation omitted).

"[A] trial court has wide latitude to enforce restrictive covenants by means of permanent

injunctions so long as the restrictions in the covenant are reasonable and 'made in good

faith, and not high-handed, whimsical or captious in manner.'" *Namleb Corp. v. Barrett*, 149 Md. App. 163, 174 (2002) (quoting *Colandrea*, 361 Md. at 394). We review a trial court's decision to grant an injunction for abuse of discretion. *Barrett*, 149 Md. App. at 168.

*Eisenstadt*, one of the cases that FOL attempts to distinguish, also included a defendant's knowing violation of restrictive covenants in a deed. 252 Md. at 359-61. The deed at issue restricted the use of certain lots to residential purposes, and limited construction thereon to "single dwelling[s]," and water connections to a single water line no greater than one inch in diameter. *Id.* at 359-60. In disregard of these covenants, Eisenstadt constructed on the land an access driveway that led to his apartment complex along with an eight-inch water line. *Id.* at 361. The circuit court reasoned that Eisenstadt "ha[d] been quite set in his determination to violate the restrictions both before and after he accepted the deed[,]" so the court "enjoined use of the land as a driveway or roadway and enjoined the running of an eight inch water line[.]" *Id.*

On appeal, Eisenstadt challenged the circuit court's injunction of his use of the driveway and asserted that the injunction of the water line was contrary to public policy. *Id.* at 361, 371. The Court of Appeals held that, first, while Eisenstadt could arguably construct a roadway for a single-family home, "the use of the property as a means of access to an apartment house or apartment houses on adjoining land not within the subdivision [wa]s not a use permitted under the restriction." *Id.* at 369. Moving to the second issue, the Court noted that Eisenstadt constructed the water line "[i]n defiance and with full knowledge of the covenant relative to the water line[.]" *Id.* at 369. The Court concluded

_____

that an injunction requiring removal of the pipe did not violate public policy because the covenant was a clear, unambiguous, and valid restriction, and Eisenstadt had other means of acquiring water. *Id.* at 371-73

This Court in *Huber* addressed a trial court's injunction requiring a defendant to destroy a shed that violated a restrictive covenant. 148 Md. App. at 193. The parties had entered into an agreement containing restrictive covenants that they recorded in the land records. *Id.* at 195-96. Neighbors brought an action for injunctive relief, seeking, in part, "the dismantling of the offending structure." *Id.* at 196. The circuit court held a bench trial and ruled that the property owner's shed violated an enforceable restrictive covenant and ordered the owners to dismantle the shed. *Id.* at 196-97. The court found that the shed was not "an innocent mistake on the part of the ownership." *Id.* at 209.

After affirming the circuit court's decision that the shed violated the restrictive covenants, this Court explored the validity of the circuit court issuing a mandatory injunction without finding the plaintiffs would suffer irreparable harm. *Id.* at 204-05. This Court noted that, ordinarily, courts will not grant injunctive relief "'unless the petitioner demonstrates that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct.'" *Id.* at 205 (quoting *El Bey*, 362 Md. at 355). Despite this, however, we concluded "that this rule does not control where a mandatory injunction is sought to enforce a restrictive covenant." *Id.* That is because, as the Court of Appeals observed, "'covenants affecting property are, even when running with the land, nonetheless contractual in nature. A suit to enforce them is *in the nature of specific performance*.'" *Id.* at 207 (quoting *Colandrea*, 361 Md. at 395). Looking to treatises and other jurisdictions,

we observed that there was "considerable authority" for granting injunctive relief "to remedy a violation of a restrictive covenant absent a showing of reparable harm." *Id.* at 209-10 (citations omitted). Accordingly, this Court ruled, "in the case of the violation of a restrictive covenant, injunctive relief would issue with no greater showing than is required to obtain specific performance, with no requirement that irreparable injury be shown." *Id.* at 211. We then compared the construction of the shed to the water line in *Eisenstadt*, both of which were *intentional acts* in violation of a restrictive covenant, and concluded that "[n]o finding of irreparable harm was required[]" to issue a mandatory injunction. *Id.* at 208-09 (citing *Eisenstadt*, 252 Md. at 373). Like the Court of Appeals in *Eisenstadt*, this Court affirmed the circuit court's "discretion in fashioning the remedy of a mandatory injunction." *Id.* at 211.

FOL's attempts to distinguish *Eisenstadt* and *Huber* are unavailing. Like the defendants in both of those cases, FOL acted with actual knowledge of the restrictive covenants and intentionally completed construction of the offending Building prior to the completion of trial. *Huber*, 148 Md. App. at 209; *Eisenstadt*, 252 Md. at 371. FOL seems to suggest that it had only constructive knowledge of the restrictive covenants but the circuit court found that FOL had actual knowledge as of 2008. FOL offers no explanation for why this finding by the circuit court is clear error. Contrary to FOL's characterization of facts on appeal, the record reveals that, like the defendants in *Eisenstadt* and *Huber*, FOL was a "willful violator" of the Setback Covenant. Despite receiving actual notice of the restrictive covenants in 2008 and again in July 2016, Rabbi Rivkin testified that FOL decided to "go ahead and build" anyway and to proceed "aggressively." This was not "an

innocent mistake on the part of" FOL, *Huber*, 148 Md. App. at 209; FOL proceeded in constructing the Building "[i]n defiance and with full knowledge of" the restrictive covenants. *Eisenstadt*, 252 Md. at 369. It was, consequently, within the circuit court's discretion to issue a permanent injunction with or without the court's finding that plaintiffs/ Appellees suffered irreparable harm. *Huber*, 148 Md. App. at 209-11.

FOL cannot avoid the underlying injunction by invoking the equitable doctrine of comparative hardship. As the Court of Appeals has explained, comparative hardship "basically provides that a court may decline to issue an injunction where the hardship and inconvenience which would result from the injunction is greatly disproportionate to the harm to be remedied." *Chevy Chase Village v. Jaggers*, 261 Md. 309, 320 (1971). Whether a defendant simply made a mistake and whether the plaintiffs have a "substantial interest" in enforcing the covenant are factors to consider in applying the doctrine. *Colandrea*, 361 Md. at 396-98 (citing *Jaggers*, 261 Md. at 320-21; *Grubb v. Guilford Assoc., Inc.*, 228 Md. 135, 140 (1962); *Liu v. Dunnigan*, 25 Md. App. 178, 193-94 (1975)). This Court explained in *Namleb Corp.* that an injunction is proper when the defendant has prior knowledge of the restrictive covenant and the plaintiffs' interest in enforcement "[i]s not negligible." 149 Md. App. at 175 (holding that trial court did not abuse its discretion by enjoining violation of restrictive covenant when the defendant had prior knowledge and "enjoining violation of the restriction was necessary to maintain the integrity of the cul-de-sac" in the subdivision). Given FOL's intentional violation of the Setback Covenant and the credible hardship to Appellees, the doctrine of comparative hardship does not apply. *Id.* As the circuit court found, FOL's completion of the Building caused a 5% reduction in value of

16 Aigburth, caused the Zolls a loss of use and enjoyment by obstructing the view from

their front porch, and harmed the integrity of neighborhood.   These hardships were not

negligible or pecuniary.   Further, FOL only began construction (beyond excavation) *after*

Appellees delivered them a stop-work letter and finished construction well *after* the initial

complaint.[10]  *See Liu*, 25 Md. App. at 193 (noting that $9,000 of the $15,000 the defendant

spent came after his knowledge of the plaintiffs' opposition, "apparently without regard

for the possible legal validity of [their] position").   In sum, the doctrine of comparative

hardship is unavailable to FOL and we discern no abuse in discretion by the trial court

fashioning an injunction akin to specific performance.  *See Huber*, 148 Md. App. at 211.

## IV.

### Attorneys' Fees

FOL moved on December 12, 2016, to strike the plaintiffs' request for attorneys'

fees, asserting that the Maryland Declaratory Judgment Act (the "Act"), Maryland Code

(1974, 2013 Repl. Vol.), Courts and Judicial Proceedings ("CJP") Article, § 3-410,

authorized the recovery of "costs" by a successful party, but not attorneys' fees.   Thus,

FOL concluded, "there is no basis, legal or factual, for Plaintiffs' claim for attorneys' fees

and it must be stricken."   The plaintiffs responded that the Act authorized a court to "make

such award of costs as may seem equitable and just," which is a basis for awarding costs

beyond those permitted under Maryland Rule 2-603.   They read this language to authorize

---

[10] We are not sure when or how much in losses FOL has incurred because it provided
no financial documents and the circuit court discredited Rabbi Rivkin's testimony that
stopping construction after the delivery of supplies would cause $600,000 in losses.

the court to "make a prevailing party whole by awarding that party the expenses it incurred in having to bring or defend a declaratory judgment action."

The circuit court granted FOL's motion on January 27, 2017. The judge reasoned that the plaintiffs "cited no authority to the court upon which it would be legally permissible to recover attorney's fees against the Defendant for a declaratory judgment[.]"

Appellees, in a cross-appeal, challenge the circuit court's denial of their attorneys' fees. They assert that, under CJP § 3-410, an award of attorneys' fees was "equitable and just" in order to make Appellees whole by awarding the expenses they incurred in having to bring a declaratory judgment action. FOL responds that the Act authorizes the court to award costs, not attorneys' fees. Accordingly, it concludes, there was no basis for Appellees' claim for attorneys' fees and we should affirm the circuit court's order denying the award of fees. In reply, Appellees maintain that the Act authorizes the court to award costs beyond those permitted under Rule 2-603. They suggest that "[i]f the General Assembly intended to limit the 'costs' recoverable in a declaratory judgment action to those permitted under Rule 2-603(b)(1), then section 3-410 [of the Act] would be unnecessary." Such an award, they conclude, would make them whole and "be fully consistent with the 'remedial purpose of [the Act] and the liberal construction it is afforded."

Maryland courts "follow[] the American Rule of attorneys' fees, which stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for breach of contract." *Long v. Burson*, 182 Md. App. 1, 25-26 (2008) (quotations omitted); *see also Rice v. Biltmore Apartments Co.*, 141 Md. 507, 516-17 (1922) ("Whatever may be the law elsewhere, it has long been the settled law of this state

that, in the absence of some statutory provision, a successful litigant is not entitled to recover the fees paid by him to attorneys for prosecuting the litigation."). This means that, "[o]rdinarily counsel fees are not awarded in a declaratory judgment action." *Maryland Auto. Ins. Fund v. Sparks*, 42 Md. App. 382, 395 (1979) (citing *New Carrollton v. Belsinger Signs*, 266 Md. 229 (1972)).

Appellees point us to no statutory provision to authorize the award of attorneys' fees in the underlying action. We discern no error in the circuit court's grant of FOL's motion to strike the plaintiffs' request for attorney's fees.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**