# EXHIBIT D

| | | |
|---|---|---|
| ROBIN ZOLL, et al., | * | IN THE |
| Plaintiffs | * | CIRCUIT COURT |
| v. | * | FOR |
| FRIENDS OF LUBAVITCH, INC., | * | BALTIMORE COUNTY |
| Defendant | * | Case No. 03-C-16-008420 |

\* \* \* \* \*

## ORDER

For the reasons set forth in this Court's Memorandum Opinion dated October 31, 2018, the Receiver's Request for Approval of Construction Management and Contractor Designation (Paper 65000) is GRANTED IN PART AND DENIED IN PART. It is ORDERED as follows:

(1) The Court appointed Receiver, Deborah C. Dopkin, is authorized to enter into a contract for services with Handy Contract Services, LLC to raze the Structure at 14 Aigburth Road; and

(2) The Receiver is authorized to engage the services of Scott M. Adashek as necessary to manage and oversee the execution of the contract with Handy Construction Services, LLC, with services to be billed on an hourly basis throughout execution of the work on site; and

(3) Defendant Friends of Lubavitch shall deposit into the Receiver's trust account the revised estimate for the cost of services by Handy Contract Services, LLC to raze the home within 45 days of receipt of a final estimate, together with $20,000 as a retainer for the services to be billed by Scott M. Adashek.

10/31/18
Date

KATHLEEN GALLOGLY COX
JUDGE

Clerk's Office: Please send copies to all parties.

| | | |
|---|---|---|
| ROBIN ZOLL, et al., | * | IN THE |
| Plaintiffs | * | CIRCUIT COURT |
| v. | * | FOR |
| FRIENDS OF LUBAVITCH, INC., | * | BALTIMORE COUNTY |
| Defendant | * | Case No. 03-C-16-008420 |

## MEMORANDUM OPINION

Presently pending before the Court is the Receiver's Request for Approval of Construction Management and Contractor Designation. A hearing was held on this matter on September 5, 2018. The parties were each given time to file a written response to the Receiver's recommendation, and the Receiver filed a supplemental Response.

In addition to the request to approve various recommendations of the Receiver, the parties have sought clarification on whether Judge Souder's Order requires the Friends of Lubavitch, Inc. ("FOL") to raze the addition that was constructed on the property, or whether that structure can be moved to a location on the property which does not offend the setback requirements. The Zolls argue that the existing Order requires that the structure be torn down, and resist any efforts to move or reconfigure the structure. The Zolls also argue that the structure should not be moved because it violates other neighborhood restrictions. FOL argues that removal does not require destruction, so the addition can be moved in compliance with the existing Order.

Throughout the post-judgment proceedings involving the Receiver, FOL has continued to seek reconsideration of their request to stay these matters pending decision on their appeal of the ruling from Judge Souder. However on October 23, 2018, the Court of Special Appeals issued its Opinion affirming the decision by the Circuit Court. Therefore the stay issues are moot.

I. **The Complaint and Trial Proceedings**

The Zoll's Complaint in this matter asserted three counts: (1) a request for a declaratory judgment and an order declaring the addition to be in violation of the setback covenant on the property; (2) a claim for breach of contract seeking an order to specifically enforce the restrictive covenant, to prohibit further construction in violation of that covenant, and to require immediate removal of the addition; and (3) injunctive relief to require FOL to remove the addition and to prohibit further violation of the setback covenant. The Complaint was later amended simply to correct a misnomer of the parties.

Judge Souder's Opinion addressed the specific claims identified in the Complaint. She found that the setback covenant governed the property, and that the construction violated its restrictions. Therefore Judge Souder granted declaratory relief stating that the setback covenant is valid and in full force and effect, and that the addition violates its restrictions. Judge Souder also granted injunctive relief and ordered FOL to "remove the Building and all other improvements that violate the Setback Covenant," and she further enjoined FOL "from constructing any structure or other improvement that violates the Setback Covenant." As noted in Judge Souder's Opinion, other objections concerning the addition were raised in the testimony, including the fact that the size and scope of the structure was inconsistent with the residential quality of the neighborhood. However these issues were not germane to the causes of action that were pled and were not addressed in the Court's findings.

The relief ordered by Judge Souder was that the building and other structures that violated the setback be "removed." In other words, to the extent that the improvements extended beyond the setback limit, those structures must be removed. The Order did not specify the method of removal, or provide any direction or limitation on how that was to be accomplished.

2

II.     Appointment of the Receiver

FOL failed to comply with Judge Souder's Order to remediate the violation. For that reason, the Receiver was appointed to explore options and to oversee compliance.

The issues in this case are complicated by the fact that the building at issue is an addition, not a separate, stand-alone structure. Thus the relief ordered necessarily entails further construction on the property. In remediating the condition, FOL seeks to move the addition in a manner which does not violate the setback provision. The Zolls vigorously oppose this request. Their opposition is based upon issues that were not before the trial court but have been repeatedly raised in other administrative forums. The Receiver properly evaluated both the services necessary to raze the addition and restore the original home, and those that would be needed to move the addition.

III.    Compliance Based Upon "Removal" of the Structure

Having reviewed the memoranda of the parties, this Court finds that "removal" may be accomplished in any number of ways, so long as the structure no longer encroaches in the setback area. In theory FOL could raze the structure, or reconfigure it so that it no longer crosses the setback line, or move it on the property.

FOL's current proposal is to remove the original home on the property and move the addition into that portion of the lot, thus eliminating the setback violation. The Receiver has tacitly endorsed that election, as the Receiver proposes that Handy Contracting Services, LLC ("Handy") and Wolfe House Movers, LLC ("Wolfe") be engaged to handle the services needed to move and reconfigure the addition. The Receiver further proposes that Scott M. Adashek be retained to provide construction management services.

3

FOL argues that the contract should be awarded to Goldstar Construction ("Goldstar"), contending that their bid was significantly lower for the same work than Handy's, and that their "track record" is comparable. FOL additionally opposes the request to retain Mr. Adashek to provide construction management services, arguing this is duplicative of the services to be provided by the general contractor.

The Zolls argue that the Receiver has exceeded the scope of her authority by proposing a solution that would permit the addition to be relocated. Therefore they urge that a contract be awarded that requires the structure to be razed, not moved.

A. History of Administrative Proceedings

Throughout the course of lengthy proceedings concerning this property, the challenge has been that the administrative body undertaking the review has not been in a posture to squarely address the underlying issue. FOL was cited twice in 2015 with Code Enforcement Correction Notices requiring that they "cease the illegal house of worship/religious institution without the benefit of meeting the RTA requirements, the parking requirements and the Non-Residential Principals Setback Requirements." They were first ordered to "cease the illegal operation of a Community Building without the benefit of a Special Exception Hearing," and then cited again for failing to cease the prohibited activity. (Code Enforcement & Inspection Citations dated January 29, 2015 and March 25, 2015). No actions were apparently taken to cease these operations. Rather, FOL sought to expand the activities, and therefore the structure on the site. FOL was again cited on June 6, 2016 with an identical violation.

In June 2015, FOL filed a Petition for Special Hearing to determine whether the property should be approved for continued use as a residential parsonage with accessory use for religious worship and religious education. The Baltimore County Director of the Department of Planning

4

recommended denial of the request, noting that the "principal use of the property as a community building devoted to civic, social and educational activities (Jewish Community Center) and that the residential use on the property is ancillary." Additionally, it noted:

> Further, by more than doubling the size of the structure while providing no additional parking or buffering, the Department determines that the proposed improvements are not planned in such a way that compliance with RTA use requirements, to the extent possible, will be maintained or that the special exception can otherwise be expected to be compatible with the character and general welfare of the surrounding residential premises.

This recommended denial was affirmed by the Office of Administrative Hearings by Order dated June 26, 2015.

FOL next filed a Petition for Special Hearing seeking approval to construct the addition on the property that is currently at issue. A number of area residents filed their own request for a Special Hearing, seeking a declaration that the current use of the property required compliance with setbacks for a community center which do not exist.

From the outset, the Department of Planning expressed concerns about the proposed addition:

> The size of the resultant structure, while meeting all setbacks still projects a massive façade towards Aigburth Road, thereby disrupting the established pattern of the existing residential improvements on either side of the subject site in terms of the structure's location relative to the right of way.
>
> \* \* \*
>
> No interior plans demonstrating residential use have been provided to this Department to aid it in understanding how the ultimate structure would function as a dwelling as opposed to an institutional building.
>
> \* \* \*
>
> Please be advised that the Department finds sufficient indication to give reasonable pause to consider if the use of the property with addition would in fact be solely for *"additional living space for the family who resides within."*

5

Following a hearing before the Office of Administrative Hearings, Administrative Law Judge Beverungen granted the FOL Petition for Special Hearing and approved construction of the addition to the existing single-family residence "to be used as additional living space for the family who reside therein." FOL applied for and received a building permit, and began immediate construction.

On de novo appeal from Judge Beverungen before the Board of Appeals, evidence was presented concerning the proposed addition. While the appeal was pending, FOL dismissed its Petition. Following the de novo proceeding, the Board of Appeals held its public deliberations on March 23, 2017 and concluded:

> The three Board members unanimously agreed that the Protestants had carried their burden of proof; that Rabbi Rivkin's testimony was not particularly credible on contested points, and that his demeanor had been dismissive towards his neighbors and truculent in general. The CBA found that the neighborhood witnesses, particularly Robin Zoll, were quite credible. The only disagreement among the Board members related to the nature of a ruling at this stage. One Board member believed, as had Judge Beverungen, that the matter was not yet ripe because Lubavitch had not yet actually used the new structure as a Chabad House. The Board member believed that only if the use of the building upon completion went beyond the scope of a residence, could the authorities intervene by way of a violation notice. The matter would then be resolved pursuant to the procedures established for resolving citations.

Ultimately, the Board of Appeals held:

> There is a unanimous finding by the CBA that Lubavitch has been acting as a community center. It has been doing so apparently since soon after Rabbi Rivkin moved to 14 Aigburth. The scope of those activities has grown over time. There was a certain natural limitation on the level of activities because of the limited size of the house. As Rabbi Rivkin has become more and more successful in his outreach efforts, the activities have grown larger than the physical plant can usefully accommodate. Like most people of goodwill, his neighbors tolerated the activities until it was announced that Lubavitch was going to expand the size of the structure with the corresponding natural expansion of its activities. At that point, the neighbors attempted to block the dramatic alteration of the neighborhood. They called upon County administrative resources in every reasonable way but without any ultimate success. Though the County was not without sympathy, its view of its authority as limited in these circumstances has resulted in a huge institutional building at the site. This building, with its promise of greatly increased activity,

6

represents a significant erosion of the neighborhood as it has traditionally been. Lubavitch has asserted that its use of the original house and now with its new addition has been as a residence with modest accessory residential uses involving student meetings, dinners, and holiday programs. Its description of its level of activity has been coy and insincere. The Protestants believe what they have seen; not what they have been told. Sadly, Lubavitch has achieved its goals by manipulating both the administrative system as well as everyone's natural inclination to defer to religious organizations. In the end Lubavitch has left the CBA with very few options, but leaving the neighbors stranded cannot be one of them.

While Lubavitch and Rabbi Rivkin have the right to use 14 Aigburth as a dwelling, the credible evidence has established that it has been and is intended in the future to be used as both a dwelling and a community center. The latter use requires a special exception and compliance with the RTA requirements, neither of which has been done. The CBA believes that Lubavitch has acted in bad faith in obtaining the building permit and constructing the addition. The CBA does not believe that it has the power or authority to order the removal of the building. All that it can do is grant the Protestants' Petition in the form of declaratory judgment.

The declaration issued by the Board was that "the use of the property at 14 Aigburth Road by Friends of Lubavitch has exceeded the use compatible with that of a residential property; that the property has assumed the dual status of a residence and a community center by consistently hosting events advertised to hundreds of people and attended by scores, and by acting as an outreach center to college students." Thus the Board found that FOL has been using the property without obtaining necessary approvals or complying with regulations.

B. Evidence of Use of the Property

Some of Judge Souder's conclusions mirror those of the Board. While Rabbi Rivkin testified that the structure "is residential in nature only," Judge Souder found him to be evasive and aggressive during questioning. By contrast, she found the testimony of Ms. Zoll concerning the use of the property as a Chabad House to be credible.[1]

---

[1] The layout of the addition is not clearly known. Based upon newspaper descriptions, the Board of Appeals alluded to the design as including a dining room that can seat over 120 people, a cloak room, men's and women's powder rooms, and a commercially outfitted kitchen. FOL

7

At the hearing on September 5, 2018, Robin Zoll testified credibly that Rabbi Rivkin openly utilizes the property as the Chabad House for both Towson University and Goucher College. She testified that the students come and go, the house is lit up throughout the night, and open invitations are posted for students to attend events and celebrate religious holidays at the Chabad House. She summarized her concerns stating that the permit was based upon residential use of the property, but the "permit is a lie, is dishonest, and has been adjudicated as such."

Mashana Rivkin also testified concerning FOL use of the property. She stressed that her family lives in the home and needed more space than the original structure. Mrs. Rivkin was due shortly to give birth to twins, so there would be seven children in the home. Mrs. Rivkin acknowledged that she and her husband are committed to their mission to provide a space where students who are Jewish have a place where they can feel at home. She acknowledged that they advertise and host dinners, and open their home to area students.

This is a mission that is central to Mrs. Rivkin, as she testified it is what her parents did in other locations after the Holocaust. However commendable the goal, based upon the evidence produced in other proceedings and the findings that were made, and based upon the testimony presented in post-trial proceedings in this Court, it is clear that the use of the Aigburth Road property as a Chabad House has expanded far beyond what can be fairly characterized as residential use.

---

disputes the accuracy of this description, but does not demonstrate the interior space. It is undisputed, however, that it is a large structure, it includes at least two apartments with outside entrances, and it is used as a Chabad House that services both the Towson University and Goucher College campuses.

8

## C. Doctrine of Unclean Hands

The doctrine of unclean hands is an equitable principal that this Court must consider in determining the direction the Receiver should take in enforcing Judge Souder's Order. The doctrine of unclean hands provides:

> [C]ourts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he [or she] seeks assistance. The doctrine does not mandate that those seeking equitable relief must have exhibited unblemished conduct in every transaction to which they have ever been a party, but rather that the particular matter for which a litigant seeks equitable relief must not be marred by any fraudulent, illegal, or inequitable conduct.

*Vito v. Grueff,* 453 Md. 88, 125 n. 8 (2017). In essence this doctrine protects courts from having to endorse or reward inequitable conduct. *Jones v. Anne Arundel County,* 432 Md. 386, 411-412 (2013).

This Court appointed a Receiver to oversee enforcement of the Order issued by Judge Souder because FOL failed to do so in a timely manner. Enforcement is not limited to razing the structure, for the reasons stated above. However to approve enforcement in a manner that will tacitly endorse that which has been repeatedly found to be a violation of existing restrictions in the residential community would constitute an abuse of this Court's discretion. The proposed plan would remove the legitimate residential structure from the lot, and maintain only that which has been found to be a community center that is not in compliance with necessary approvals or regulations. This is precisely the type of circumstance that the doctrine of unclean hands is intended to protect against.

## D. Selection of Contractor

FOL posed objections to the Receiver's selection of the principal contractor, and to the added expense for services of a construction manager. This Court finds that the Receiver has

9

diligently researched options and has provided sound, and prudent reasons for her selection of Handy as the general contractor. With regard to construction management services, while this Court believes it is reasonable and appropriate to employ Mr. Adashek to oversee the construction, the scope of services will vary greatly from those originally estimated. Further it appears those services should be billed based upon hourly rates for time required on-site or otherwise to manage this project, rather than at a per-diem rate for the totality of the project.

IV. Conclusion

For the foregoing reasons, the Receiver's Motion for Approval is granted in part. The Court will authorize the Receiver to engage the services of Handy to raze the addition, with construction management overseen by Mr. Adashek. This Court declines to authorize moving the existing structure to replace the original home on the lot, as that would authorize the continuation of a commercial use that has been found to be non-compliant with restrictions on the property.

10/31/18

Date

KATHLEEN GALLOGLY COX
JUDGE

Clerk's Office: Please send copies to all parties.