# EXHIBIT E

1    IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

2    ROBIN ZOLL, et al                 *

3                      PlaintiffS     *    Case Number

4    v.                               *    No. 03-C-16-008420

5    FRIENDS OF LUBAVITCH, INC         *

6                      Defendant       *

7                        *   *   *   *   *

8              OFFICIAL TRANSCRIPT OF PROCEEDINGS

9

10                                     Towson, Maryland

11                                     September 5th, 2018

12

13   BEFORE:

14       THE HONORABLE KATHLEEN G. COX, Administrative Judge

15   APPEARANCES:

16       For the Plaintiff:

17           MICHAEL R. McCANN, Esquire

18       For the Defendant:

19           KIMBERLEY MANUELIDES, Esquire

20       Receiver:

21           DEBORAH C. DOPKIN, Esquire

22   Reported from a recording by:
     Steven D. Perrine
23   Official Court Reporter
     Circuit Court for Harford County
24   20 West Courtland Street, Second Floor
     Bel Air, Maryland 21014
25   sdperrine@gmail.com

1        (PLEASE NOTE:  Because of the inability to

2   have access to the court file at the time of preparation

3   of the transcript, some references and/or proper names

4   may be spelled phonetically.)

5

6

7                SEPTEMBER 5th, 2018

8

9        MR. McCANN:  This is Zoll versus Friends of

10   Lubavitch, Inc., which is case number 03-C-16-8420.  If

11   I can get counsel to identify themselves on the record?

12        MR. McCANN:  Good afternoon, again, Your

13   Honor.  Michael McCann here on behalf of the Plaintiffs.

14        MS. MANUELIDES:  Kim Manuelides on behalf of

15   the Defendants.

16        MS. DOPKIN:  Deborah Dopkin, Receiver

17   appointed by this Court.

18        THE COURT:  Good afternoon.  Now, we have

19   had some preliminary conversations in chambers.  This

20   hearing was set after a series of status conferences

21   that were done by telephone to sort of proceed forward

22   in responding to the motions for clarification and the

23   motion for -- basically we're here to seek the

24   enforcement of the ruling from Judge Souder which is now

25   going back some point in time.

13:03:57

1    Judge Souder had appointed Ms. Dopkin to

2 serve as the Receiver.  She has explored construction

3 options and various contractors to do the work and has

4 looked at a variety of options.  This hearing was

5 scheduled to sort of review those options and get the

6 recommendations from the Receiver.  She has filed this

7 afternoon the motion to appoint a construction

8 management and contractor designation which has several

9 attachments which sort of summarize the investigation

10 that she has done and the recommendations that she is

11 making to the Court.

12    In my conversations in chambers, obviously

13 while there has been some discussion of some of this

14 along the way with counsel, the motion and the

15 attachments were just provided to both counsel this

16 afternoon.  So, I understand that there is a request to

17 have sometime to review this, discuss it with another

18 construction manager and respond if appropriate, but at

19 least to sort of digest it.

20    In the meantime, there are all sorts of

21 people that are present here today.  So, my suggestion

22 is that we figure out whatever information people want

23 to present today on all of the open issues.  I will

24 allow a period of time to digest the information that is

25 contained in the Report and Recommendation and to

13:05:23   1   respond if you wish to, but I do want to move forward

2   and at least take some testimony if people want to have

.3   it.

4            I also want to provide an opportunity to

5   talk to the proposed construction manager and to ask any

6   questions and get clarification on any of the

7   attachments that are provided.

8            So, I think that that is where we are at the

9   present time.

10            I'll start with Ms. Dopkin.  Do you want to

11   state anything on the record that you want in terms of

12   where we are?

13            MS. DOPKIN:  Since our last status

14   conference, I have continued working with Scott

15   Attachak, the construction manager.  He is here in the

16   courtroom.  He has gone back as requested by Defendants

17   to their contractor to try to get comparable

18   line-by-line proposals that could be compared.  He has

19   also investigated licensing, insurance, references,

20   processed the whole nine yards.  He has spoken to both

21   the solar company and the house moving company and

22   proposed a timeline.  He can address how that timeline

23   is different if the addition, the structure referred to

24   in my motion, is simply razed as opposed to whether that

25   structure is relocated on the lot.

13:07:09  1          He and I have agreed on a contractor

2    regardless of which option is pursued.  It is called

3    nextdaydemolition.com., but it is actually Handy

4    Contracting Services.  I believe that I gave counsel

5    their proposal back in early August.  It has been

6    finessed some and Mr. Attachak can explain that.

7          There is also in my motion a request to

8    approve the selection of Handy Construction, the

9    selection of the house moving contractor, and the formal

10   engagement of Mr. Attachak and payment for his time to

11   date.

12         He can also explain to the Court and to the

13   parties, as I said, the difference in timing and where

14   within the proposal there are opportunities or occasions

15   where costs might be reduced and savings effected.

16         I would be happy to introduce him to the

17   Court at this time.

18         THE COURT:  Okay.

19         MS. DOPKIN:  Mr. Attachak?  I would offer

20   you a chair.

21         THE COURT:  If you want to move one of those

22   up to either table, it matters not.  It looks like the

23   table with Ms. Dopkin is probably the less crowded of

24   the two.  If I can just get you to state your name for

25   the record.

13:09:01

1          THE WITNESS:  Scott Attachak.

2          THE COURT:  Good afternoon.  Let me start

3 with does either counsel wish to ask questions of

4 Mr. Attachak to get clarification on any of the items

5 that are contained in the proposals or the report?

6          MR. McCANN:  I have a couple, Your Honor, if

7 I could.

8          THE COURT:  Okay.  Do you want him under

9 oath on the witness stand?

10          MR. McCANN:  He can stay here.

11          THE COURT:  Okay.  Have a seat.

12          MR. McCANN:  Thank you, Your Honor.

13          SCOTT ATTACHAK,

14 BU MR. McCANN:

15    Q.  I guess the first question I wanted to ask you

16 about was the timing of demolition versus moving.  We

17 have part of Deborah's motion was an actual calendar.  I

18 take it you prepared this?

19    A.  I did.

20    Q.  Let's assume that the Court orders that the new

21 structure, the addition in front of the existing house,

22 is to be removed.  Can you identify by reference to this

23 calendar when that process would be done?

24    A.  Actually, no.  This calendar had several

25 assumptions.  The primary assumptions were that we were

13:10:13   1   going to be starting on an immediate basis.  It doesn't

2   really matter when we start, but the time that we start

3   and the time that we finish is basically linear only

4   dependent upon weather.  But this is based upon moving

5   the addition sixty-two feet to the rear of where it is

6   right now.

7        The demolition would probably take about half the

8   time that this shows.  This shows approximately

9   sixteen weeks.  The demolition, clean up afterwards and

10   everything will probably take about seven and a half to

11   eight weeks.

12   Q.  When you say the finish --

13        THE COURT:  Can you all do me a favor?  You

14   are looking at each other and I'm having a hard time

15   hearing and the microphones will have a hard time

16   picking up it up.

17        MR. McCANN:  Okay.  I think his response was

18   that it would take seven and a half to eight weeks if we

19   just were to raze the new structure.

20        THE WITNESS:  Clean it up and leave it as a

21   buildable lot, that's correct.

22   BY MR. McCANN:

23   Q.  The second category of questions I have I guess

24   relates to any accommodations or efforts that will be

25   made to limit the impact on the immediate neighbors

13:12:11   1   during this process, whether it be demolition or moving.

2   Can you give us a sense of that?

3        By that I mean, just so you know, hours of work,

4   whether there will be work on the weekends, anything

5   else along those lines other than just I guess times.

6       A.   Okay.   Well, let me start with impact regarding

7   sediment control issues, because that is probably the

8   primary issue that causes problems with neighbors.

9            MS. MANUELIDES:   Can you speak up?

10           THE WITNESS:   I apologize.   I have a bit of

11   a sore throat.

12           THE COURT:   That's okay.

13      A.   We have sediment control fixtures that are in the

14   budget right now and will be put in place first.   That

15   will basically mitigate any dirt from getting onto the

16   public roads and getting off of the area.   Well over

17   seventy-five percent of the complaints that people have

18   during construction have to do with dirt on the roads,

19   messes that are caused.

20      Q.   These are the silt fences that is we all see at

21   construction sites?

22      A.   Right, the silt fence and the super silt fence.

23      Q.   So, the silt fence would surround this entire

24   lot?

25      A.   Not the entire.   This is an uphill lot.   Pretty

13:13:35

1   much the sides and the front are going to be protected

2   and there is going to be some additional stone put down

3   along side the entrance so that there is a sufficient

4   size for a construction entrance. That way heavy

5   equipment moving onto the property and back off will not

6   drag soil off the property.

7          Regarding work time, Baltimore County has very

8   set times on when construction can happen and when it

9   can't happen. We're not going to be planning anything

10   on the weekends as you will see. We're going to be

11   handling all of the construction which creates potential

12   for noise or any other type of issues pretty much

13   between 7:30 and 3:30.

14      Q.  Okay.  So, in terms of the moving of the existing

15   or the new structure and demolishing the existing house,

16   will there still be a silt fence?

17      A.  There is still a silt fence from the beginning

18   until the end.  After the silt fence is removed, any of

19   the landscaping that was disturbed, we have a budget

20   basically for stabilizing, for replanting, for

21   regrassing?

22      Q.  So, the silt fence will be there with that latter

23   option, but it will be in place of (inaudible)?

24      A.  Right.

25      Q.  There will still be heavy equipment coming in and

10

13:15:21   1   out?

2       A.   Yes.

3       Q.   The schedule in terms of weekdays versus

4   weekends, the times that you indicated would be the

5   same?

6       A.   Yes.

7       Q.   But just twice as long?

8       A.   Pretty much, yes.

9       Q.   In your experience, you have seen I take it silt

10   fences not work?

11      A.   Yes.   The silt fence has to be installed

12   properly.   It actually has to be built into the ground

13   approximately six inches and turned towards the inside,

14   filled up on the inside so that it actually catches any

15   rain water plus sediment that comes across so that the

16   water can bleed through and the sediment can stay there.

17      Q.   And you indicated that the grade of this property

18   is?

19      A.   It is uphill from the front to the rear.   So,

20   there is a concern regarding making sure that nothing

21   gets on the street.   But this is not a mountain lot by

22   any means.   This is just something that in normal

23   construction processes will be taken care of.

24      Q.   When you mentioned heavy equipment, what type of

25   equipment are we talking about?

13:16:26   1    A.   You're going to be dealing with loaders and

2   you're going to be dealing with dozers.   Assuming that

3   we're going to actually be moving the structure, we're

4   going to be lifting the house using machinery and

5   physically moving it sixty-two feet towards the rear.

6    Q.   What type of machinery?

7    A.   There are basically beams and posts that lift the

8   house up that are motorized and have wheels on both

9   sides and they will be traveling basically at the same

10   time front and back sixty-two feet towards the rear and

11   then, not dropping it, but positioning it over the

12   foundation which needs to be poured or placed actually.

13   Then we're going to be razing the foundation to the

14   level of where the silt plates are.   At that point we

15   can disconnect the machinery and they can be removed

16   from the site.

17    Q.   I take it that machinery is pretty loud?

18    A.   I don't really know what the decibels will be,

19   but normal construction equipment.   It is not that loud

20   from a fifty foot distance.   The operators do wear ear

21   protectors, but you and I could have a conversation like

22   this on the site and still have the equipment moving

23   towards the rear of the courtroom.   I mean, thirty feet

24   away it should be sufficient so that we can have a

25   normal conversation.

13:17:47

1    Q.  I guess I wasn't talking about conversation.  I'm

2    talking about impacts on neighbors who are trying to sit

3    on their front porch and have coffee for instance.

4    A.  The equipment is loud enough so that they will

5    hear it.  I can't imagine it is going to be louder than

6    normal road construction work, which they hear every

7    day.

8    Q.  Okay.  You have obviously been to the site?

9    A.  Yes.

10   Q.  So, you have seen the new structure on the front

11   of the existing house?

12   A.  Actually that I haven't.  My family owns property

13   on Aigburth and I have been around the site for the last

14   two years, but I haven't visited it in approximately a

15   year.  So, I have not seen it since the site was

16   approved.  Actually, no, I saw it since the site was

17   approved.

18   Q.  I'm not talking about the inside of the house.

19   You have seen the outside of the building?

20   A.  Yes.

21   Q.  And it is considerably hiring than the existing

22   house?

23   A.  Yes.

24   Q.  So, you're moving a much higher building.  If

25   moving is back is approved, you're moving a much higher

13:18:50   1   building to the location of the existing house?

2     A.   Right.

3     Q.   And it will be a bigger footprint?

4     A.   I'm not sure.  I mean, the addition of the

5   footprint is larger than what the original structure

6   was, yes.

7     Q.   That's my question.  The addition is 6,800 square

8   feet.  Is that correct?

9     A.   I'm not sure how large.

10     Q.   And the existing house is how bit?  Do you know?

11     A.   I'm not sure.

12          MR. McCANN:   Thank you, judge.  Nothing

13   else.

14          THE COURT:   Ms. Manuelides, do you have any

15   questions that you wish to ask?

16          MS. MANUELIDES:   Not at this time, Your

17   Honor.

18          THE COURT:   Can I ask just one question?  On

19   the move the house proposal, I understand that it would

20   take -- I mean, you are saying basically double the time

21   between the time that it would take to just simply

22   demolish the structure versus onto move it back on the

23   lot?

24          THE WITNESS:   Yes.

25          THE COURT:   In that additional timeframe,

_____14_____

13:19:44  1   how much of that is the actual movement of the house

2   versus the prep, the foundation work and all of the rest

3   of it?

4           THE WITNESS:   The actual move is seven to

5   ten days at the maximum.   Sixty-two feet is not that

6   large.   The real issue has to do with the soils on the

7   side, making sure that they are stabilized so there is

8   no listing or sinking.

9           THE COURT:   The moving it back

10  sixty-two feet is a week to ten days?

11          THE WITNESS:   Right.   That is including

12  setup, move and taking the equipment apart.

13          THE COURT:   Thank you.   Anything else by

14  either side?

15          MR. McCANN:   No.   Thank you, Your Honor.

16          MS. MANUELIDES:   No.   Thank you.

17          THE COURT:   Thank you for being here this

18  afternoon.   I appreciate your time.

19          Anything further before we release the

20  witness?

21          MS. DOPKIN:   I do not have anything further

22  to ask of Mr. Attachak.

23          THE COURT:   Thank you, Mr. Attachak.

24          THE WITNESS:   Thank you, Your Honor.

25          MR. McCANN:   Thank you, sir.

13:21:20

1    THE COURT:  Were there questions of

2    Ms. Dopkin that either of you had?

3    MR. McCANN:  No, Your Honor.

4    MS. MANUELIDES:  No.

5    THE COURT:  Was there other testimony or

6    information that either side wishes to present since

7    we're here today and you have lots of people present?

8    MR. McCANN:  We would, Your Honor.

9    THE COURT:  I'll be glad to hear it.

10   MR. McCANN:  As I indicated in chambers, not

11   all of these folks will testify today.  What I would

12   like to do, if possible, is for me to say something

13   briefly I guess on the issue of razing versus removal.

14   THE COURT:  Okay.

15   MR. McCANN:  Or relocating, and then

16   actually have Ms. Zoll be the sole witness to come up

17   and talk.

18   THE COURT:  That's fine.

19   MR. McCANN:  Great.  So, I'll be as brief as

20   possible, Your Honor.

21   The main thing I want to do is sort of renew

22   and maybe even restate some of the arguments that we

23   have already made in response to the motion for

24   clarification.  I'll try to be brief.  That is the

25   motion, as you know, Your Honor, that first raised this

13:22:17

1  notion of moving this illegal structure back on the same

2  lot.

3       Number one, and I indicated this in

4  chambers, but this motion should have been filed long

5  ago after Judge Souder's order was first issued in April

6  of 2017 and it should have been filed as we all know

7  under the rules providing for post-judgment motions, and

8  those Rules are 2-534 and 2-535.

9       There is a process in the Rules for these

10  type of requests, Your Honor, and for some reason, I

11  haven't figured out yet, why we're ignoring that

12  process.  There is a process for it.  Nothing has

13  changed since April of 2017 that would warrant a filing

14  fifteen months later, nothing.

15       The only thing that has happened is that

16  Ms. Dopkin has been appointed.  Certainly her

17  appointment in and of itself doesn't create any

18  ambiguity in Judge Souder's order of April of 2017.

19       What is ironic about all of this is that we

20  would not be sitting here today having this conversation

21  at all if we had not filed a motion to appoint a

22  Receiver.  The only reason that we filed a motion to

23  appoint a Receiver is because the Defendant was doing

24  simply nothing to comply with this Court's order.

25       By nothing, I mean in April of 2017 Judge

13:23:55

1    Souder issued an order to remove the structure by

2    March 1st, 2018.  That day came and went.  Motions to

3    stay the enforcement of Judge Souder's order were filed

4    after that deadline had already passed and they were all

5    denied.  So, it was clear to us that nothing in the

6    world, short of a Receiver perhaps, was going to get

7    this Defendant to do what it was supposed to do under

8    the law.

9              So, there is some irony in all of that and I

10   just wanted to point that out.

11             If they had filed a timely motion under

12   2-534 and 2-535, we would be in a completely different

13   position right now, Your Honor.  Judge Souder, now

14   retired, would have been around to review all of this

15   and given the fact that she sat through this trial,

16   viewed firsthand the credibility of the witnesses, heard

17   all of the testimony, she would have been able to decide

18   that issue had it been raised timely rather easily.

19             I can assure you.  For what it is worth.

20   Judge Souder would not be giving this Defendant any

21   breaks.  And it has gotten breaks.  It has benefitted by

22   its own failure to follow the Maryland Rules, it meaning

23   the Defendant.  Somehow it last been successful in

24   raising an ambiguity in the order when none was ever

25   raised before.  Not a single whiff of an allegation of

13:25:36

1  ambiguity was ever made during the trial in this case or

2  in the subsequent many months.  So, the Defendant has

3  benefitted from its own violation of the Rules and it's

4  constructive contempt of court.  As of March 1st, 2018,

5  this Defendant was in contempt of court and has done

6  nothing since then, its motions having been denied to

7  stay, to cure that.  It is in contempt of court as we

8  sit here today.

9          So, in my humble opinion, I do not believe

10  this Court should be bending over backwards to assist

11  this Defendant in any way, give it any considerations,

12  give it any conveniences, give it any consideration of

13  cost or a benefit of moving this structure back.

14          All of everything that I just said, of

15  course, doesn't take into consideration the impact on my

16  clients.  I haven't even mentioned that yet.  With each

17  passing day, even the latest possible day, March 1st,

18  2018, my clients have had to live with this monstrosity

19  of a building in their front yard and look at it every

20  morning.

21          Now, if Your Honor approves the moving of

22  that building, that 6,800 square foot building, they

23  will have to live with the same structure, which as this

24  witness just indicated is a bigger structure than the

25  existing house.  I mean, you have seen it.  It is tall.

13:27:02

1    It is much taller than the existing sort of ranch house

2    that is there now.  So, not only are they having to live

3    with this in the meantime since the order has been

4    violated and they are in contempt, but if the building

5    is allowed to be moved they are going to live with a

6    bigger building.

7            So, as I said in chambers, how they continue

8    to be victims in all of this is simply beyond me when

9    they won this case many, many months ago.

10           A couple of more points, Your Honor.

11   Allowing the structure to be moved back would also

12   violate other laws in two respects.  Number one, this

13   building as it stands is in violation of the covenants

14   because it doesn't have a slate roof.  Actually the

15   covenants themselves are attached to our response to the

16   motion for clarification, Exhibit 1, states plainly that

17   a slate roof is required.  That may seem minor to you,

18   in the scheme of things it may seem minor, but literally

19   if you were to allow this building to be moved back

20   you're countenancing yet another violation of the law

21   because the building would be moved back and it will

22   violate the covenants.

23           More importantly, and there has been a lot

24   of discussion of this Board of Appeals order in December

25   of 2017, moving it back would effectively violate that

13:28:39

1    order.   The Board of Appeals held, and this is Exhibit 4

2    to our opposition to the motion for clarification, that

3    the addition was not only used and designed as, but was

4    constructed as a community center which is illegal under

5    the zoning regulations.   This is a 6,800 square foot

6    addition with a dining room for 120 people, separate

7    men's and women's bathrooms, a commercial kitchen, a

8    library, a conference room, a student lounge, apartments

9    on the second floor with their own entrances.   Allowing,

10   as I said, the Defendant to move the structure back

11   would violate the Board's order because there is no

12   legitimate doubt that this Defendant will continue to

13   use the structural for an illegal purpose.

14              In fact, attached to our response to the

15   motion for clarification, this is just a couple of weeks

16   ago, we had Facebook pages and they are still inviting

17   people to events and still doing exactly what the Board

18   of Appeals said they cannot do.   So, any suggestion that

19   all of a sudden when this building is moved back, if it

20   is moved back, that these type of activities will stop

21   is just pure silliness.   No one would believe that.   No

22   one in the county would believe that and no one on this

23   side of the courtroom anyway would ever believe that.

24              Another point of why we believe the building

25   itself illegal.   I know that is sort an esoteric point,

13:30:06  1   but the Board of Appeals clearly held that the only

2   reason that this addition was able to be built in the

3   first place is that a permit was obtained illegally,

4   fraudulently I would submit.  The Board held that the

5   permit was obtained dishonestly and in bad faith when it

6   represented on its face that this would be used as a

7   residence and a residence only.

8           In fact, Rabbi Rivkin acknowledged this

9   dishonesty when he said to my client, and the Board of

10   Appeals made much of this statement, he said to her when

11   she challenged him about his honesty, he said "I was as

12   honest as I could be to get my permit".

13           Finally, Your Honor, I have asked before and

14   I'll ask again at least for the record, that my clients

15   be awarded their attorney's fees.  They have spent a lot

16   of money.  I'm not talking about attorney's fees from

17   the point of trial.  I'm talking about from the date of

18   March 1st to the present.  From that day, as I

19   mentioned, the Defendant has been in constructive

20   contempt of court.  Its motions to stay have been

21   denied.  As a result of all of its machinations since

22   then we have had to respond.  We have had to oppose

23   those motions.  We have had to file to appoint a

24   Receiver to bring us here today.  All of those fees

25   since that date and not before I think were incurred as

13:31:44

1    a direct result of their contempt of court and their

2    violations of the Maryland Rules and the Board's order.

3              So, what I would like to do in terms of

4    evidence and then I'll just close with this, Your Honor,

5    I have all of my bills since March of 2018 to the

6    present.  I have very carefully excluded any of the fees

7    associated with the ongoing appeal to the Court of

8    Special Appeals which I think or I know Your Honor is

9    aware of.  So, I have a copy of that that I would like

10   to submit to the Court if I could.

11             THE COURT:  Sure.

12             MS. MANUELIDES:  I would object to that,

13   Your Honor.

14             THE COURT:  You do or don't?

15             MS. MANUELIDES:  I do object to that, Your

16   Honor.  That is not before the Court today.  There is no

17   motion for fees pending today.  There is no basis to

18   submit them for something like that today.

19             THE COURT:  Well, I'm going to allow him to

20   make it and submit it.  If there is a motion for fees

21   and there is a motion for feels being proposed, I need

22   to know the legal basis on which you believe you're

23   entitled to fees, because under the contempt rules

24   typically fees are not an appropriate subject of a purge

25   in a contempt proceeding.

13:33:04  1        MR. McCANN:  Right.

2        THE COURT:  So, there would have to be a

3   legal basis that raises the issue.  I'll allow you to

4   mark it and I'll take the exhibit, but I don't think

5   that issue is properly before me and certainly isn't

6   before me in a way that Ms. Manuelides has had an

7   opportunity to respond to it in terms of legal argument

8   on it.

9        MR. McCANN:  Okay.

10        THE COURT:  We clearly are coming back at a

11   later point because of the timing and the opportunity to

12   respond to what the motion was that was filed today.

13   So, I'm going to allow him to just submit it.

14        MR. McCANN:  Thank you, Your Honor.  May I

15   approach?

16        THE COURT:  Sure.  I'll just mark it as

17   Hearing Exhibit 1.

18        (WHEREUPON, THE EXHIBIT WAS MARKED FOR

19        IDENTIFICATION PURPOSES ONLY AND THE

20        FOLLOWING ENSUED.)

21        MR. McCANN:  With that, Your Honor, unless

22   you have any questions, I'll call Ms. Zoll.

23        THE COURT:  That's fine.

24        MR. McCANN:  Thank you.

25        THE COURT:  Do you want testimony under

13:44:55  1   oath?  It may be easier if you sit there just in terms

2   of the microphone.

3            MR. McCANN:  Okay.  May I also ask, Your

4   Honor, is it okay if she just speaks or do I need to ask

5   her questions?  I think she has something to say and she

6   would like to say it if that is okay.

7            THE COURT:  Do you have any objection to

8   that process?

9            MS. MANUELIDES:  That's fine.

10           MR. McCANN:  Thank you.  Swear her in.

11   That's fine.

12                    ROBIN ZOLL,

13   the witness, having been first duly sworn, was examined

14   and testified as follows:

15           THE CLERK:  State you full name spelling

16   your name for the record, please.

17           THE WITNESS:  Robin Zoll, R-O-B-I-N

18   Z-O-L-L, 16 Aigburth Road, Towson, Maryland.

19           THE COURT:  You can have a seat.

20           THE WITNESS:  Thank you.

21                DIRECT EXAMINATION

22   BU MR. McCANN:

23      Q.  Go ahead, Ms. Zoll.

24      A.  First of all, Your Honor, I would like to talk

25   about the impact this would have, the plan to move the

13:46:22

1    building to the back of the property, the impact it

2    would have on us.

3         First of all, as I explained to Judge Souder

4    during our trial, the building at that time in front of

5    the property, of course, blocked the front of our house,

6    the porch and the bedrooms up in the front.  She found

7    that significant.

8         If the building is moved back on the property, it

9    will then be along side our entire house.  It will no

10   longer be just in the front yard of the house effecting

11   or even at a little bit at an angle the front of the

12   house.  It will be smack on the side of our house, the

13   entire house.

14        We have a large sun room on our main floor that

15   is surrounded by long windows, a glass room basically.

16   We have a den.  We have bedrooms on the second floor.

17   We have bedrooms on the third floor.  All of this would

18   be looking out at this structure taller than our house,

19   three stories high, much taller of course than the

20   existing home that is there.  It is a solid brick wall

21   ten feet, because it was built with a residential permit

22   and only a ten foot setback instead of the special

23   requirement of fifty.  So, it is ten feet from our

24   property line and there we would be looking at it

25   through the windows of our entire home.  That would be

26

13:48:07

1   much worse than what we had than when it was in front.

2          Secondly, the noise and the lights from the

3   building.  Right now the building is in front of the

4   house.  The building is kept lit all night, every light

5   in the place.  I have a picture of it and pictures I

6   think have been submitted before Judge Souder as well.

7   The organization advertises that this is open 24/7,

8   always open on the Facebook.  Indeed, they keep the

9   lights on like Motel 6 all night, but it is every light

10  in the house.  That would now be next to our home

11  shining in all of our bedroom windows and all of our

12  downstairs rooms from this structure just a few feet

13  away.

14          The side entrances, it has two side entrances

15  which are actually closer to our property than the wall

16  of the home.  They are maybe six or seven feet setback

17  from our property line.  They are right on our property

18  line.  I have a picture of those.

19     Q.  Go ahead and finish.

20     A.  Okay.  So, they are hanging out.  There are two

21  landings on each of the outside entrances.  They are for

22  the apartments inside the structure.  Boarders live in

23  the apartments.  They come and go.  I see them coming

24  and going from the side entrances day and night.  They

25  congregate on the landings sometimes in the middle of

13:49:54

1    the night noisily.  They hang their towels and laundry

2    to air on the railings.  There was one there this

3    morning I saw as I was leaving.  That's what they do.

4         These outdoor entrances, now looking out at the

5    front yard would be looking smack on our sun room and

6    the windows from the side of our house.  Our bedrooms

7    upstairs would be almost -- it would be like we would be

8    in a tree house together just a few feet away.

9         The kitchen.  One of the provisions of the

10   covenant that was not litigated is that the kitchen has

11   to be on the west side of the property.  That would be

12   away from our house.  Obviously the reason for that was

13   so our house, which did the covenant in the first place,

14   would not get the exhaust and so on from the kitchen.

15   The kitchen is undisputed is on the east side of the

16   house.  It is on our side of the house.  I believe

17   Mr. McCann put a picture in and I have another of all

18   the exhaust for the kitchen right outside or right on

19   our side of the house.  Now it exhausts into the front

20   yard.  I mean, the exhaust goes into the front yard.  Of

21   course, again if it is moved back next to our property,

22   the exhaust will come right in our sun room windows from

23   that kitchen because that is exactly where it would be.

24   It is covenant violation to be there in the first place.

25        At the hearing in front of Judge Souder, I

13:53:22

1  testified about the construction process, the original

2  construction process to erect the structure in the first

3  place.  It was horrific.  They started at seven in the

4  morning and they ended at dusk.  It went on for many

5  months, I think about six months.  The debris and the

6  dust, it was during the summer originally and went the

7  fall.  We had to keep our windows shut.  Nonetheless,

8  the dust and debris got on our porch, on the cars, on

9  the streets and so on.

10      This proposal to move it back is going to be an

11  even bigger construction project.  It is going to

12  require demolition of the original house.  That is a

13  '50's house.  It contains I'm sure lead and asbestos.

14  There have been many articles lately in the paper about

15  the dangers of that, the asbestos dust from those old

16  demolitions of old houses.  So, that is what we would be

17  experiencing.

18      There would be another excavation, because they

19  would have to excavate for the basement and all the

20  things that they have in the basement, brand new

21  excavation out there in the backyard now again.

22      Then, of course, the moving itself, which sounds

23  rather minor compared to all of the months that

24  Mr. Handy I believe has described of getting ready for

25  it.

13:55:03

1    To live through another construction project

2    again, especially when it is really a construction again

3    of this illegal structure is really intolerable.

4    Let me point out one other thing about the

5    demolition of the existing structure.  The existing

6    structure is the home where the Rivkins actually live

7    and always have.  So, this structure that is built with

8    a residential permit, which we all know wasn't true, it

9    was dishonest, is going to be the only building now on

10   the residential property.  The actual residence for the

11   Rivkin family will be gone, which I just find that sort

12   of a stunning fact.

13   Another problem for us is the diminution of our

14   property values.  Again, Judge Souder found it

15   significant that our property values were reduced by the

16   tax assessor five percent because of economic

17   obsolescence specifically because this building blocked

18   our property and it was in the front.  Moving it to the

19   back blocking it entirely, the entire home itself, is

20   certainly not going to increase our property values and

21   I would posit they would be decreased either further

22   from the added interference from this structure.  As I

23   said, Judge Souder did weigh that and rather heavily and

24   commented on that in her opinion.

25   Our neighborhood.  Our neighborhood is a

13:57:04  1    residential neighborhood.  It is an old neighborhood,

2    even historic, well-established families live there.  We

3    have block parties.  We have an active community center.

4    You can see many of our neighbors are here today about

5    this.  This is something that concerns all of us.  Cedar

6    Avenue is the oldest street in Towson and runs along

7    side our home.

8         Agreeing to this proposal to move this

9    residence -- I'm sorry, to move this structure back on

10   the property and allow it to continue to exist, and it

11   would continue to exist, the sign is still in front of

12   the building, Rabbi Rivkin has made no bones about it it

13   will continue to exist as the Shabbat of Towson and

14   Goucher.  That's what it is.  That is what it has been

15   for ten years always before the structure.  The original

16   home was the Shabbat of Goucher and Towson.  It will

17   continue to be that if this Court allows it to be moved

18   to the back of the property and it will be the only

19   thing on the property.

20        So, our residential neighborhood will then rather

21   permanently have Towson University moved right in its

22   midsts.  We will essentially become part of the Towson

23   University campus.  That's of concern to every single

24   one of us here today.

25        The building has no provisions of course for

13:58:50

1    parking or for trash such as are required for a

2    commercial building.  What do you call them?  Dumpsters

3    and a certain number of parking spaces and so on.  There

4    are requirements.  I'm not sure what they are exactly,

5    but this has none because it is a residence technically.

6         The worst thing about moving this building back

7    on the property instead of simply demolishing it is it

8    won't end the case.  This case will go on.  It virtually

9    guarantees future litigation with respect to the

10   covenant and with respect to the zoning.  It just will.

11   It perpetuates this all of experience for all of us.

12        The other thing that I would like to point out is

13   Friends of Lubavitch does not yet have a permit for this

14   new building to move it.  They need a permit to place it

15   on the property.  They can't just do it.  And they can't

16   do it under the existing permit that they have, which is

17   for a residential building.  It is dishonest and it has

18   been declared so.  It cannot get a new permit, it seems

19   to me, without complying with the setback and the other

20   zoning requirements for a commercial center, for a

21   commercial structure.  That's impossible now that the

22   building is completed.  They can't make it smaller.

23   They can't make it fit with a fifty foot setback.  It is

24   impossible to change it because it is built.

25        So, this motion for clarification, seems to me,

14:00:56

1   is really nothing more than an attempt by this

2   organization, kind of a Hail Mary pass to use Judge

3   Souder's order to remove the building as a sword to get

4   around the findings of the CBA, which it did not appeal,

5   to continue the illegal operation of its student center

6   without obtaining special permits or complying with the

7   setback requirements for a commercial building and to

8   legitimize its residential permit.

9       An order from this Court sanctioning placement of

10  the existing building on the back of the property would

11  give Friends of Lubavitch commercial operation the

12  legality it has never been able to get all of these

13  years and has been trying to.  They had to lie to get

14  the permit that they have as you have heard Rabbi Rivkin

15  say, as much as I had to get the permit.  So, they have

16  never been able to get a legal permit and they still

17  can't.

18      If this Court passes an order, the order that

19  they requested which says that placing it on the back of

20  the property would satisfy Judge Souder's order, then

21  they would have legitimacy, they would trump the zoning

22  laws, they would negate the CBA order, they would be on

23  their way and there would be very little anyone could do

24  about it down the road.

25      We were in the Court of Special Appeals yesterday

14:02:48

1   with the appeal in the case and one of the judges

2   commented how can they move the building on the property

3   if the CBA determined the permit was in error? She

4   didn't, and nor do we.

5        As mentioned, I guess we have already talked

6   about the covenant provision still being in effect.  I

7   want to point out that the Friends of Lubavitch have not

8   appealed the validity of the covenant.  The appeal which

9   was heard yesterday does not involve that.  The covenant

10  we all agree is a valid covenant, runs with the land and

11  is enforceable, and we have not waived any of its

12  provisions.

13       Another thing about attorney's fees.  I would

14  like to say a few things.

15            THE COURT:  That ends up being a legal

16  argument.  I think there are certain things that you can

17  comment on in terms of what is in front of me.  The

18  attorney's fees is not one of them right now.  It is not

19  a matter that is before me appropriately, other than

20  your attorney has submitted a bill.  Neither side has

21  briefed it.  There isn't a proper request for it.  So, I

22  think I have given a lot of latitude in terms of

23  commenting on the issue that is here today, but I think

24  that one is not one that is properly here.

25            THE WITNESS:  All right.  Well, you have

34

14:04:34

1   have been very generous with your latitude.  I

2   appreciate it.  Thank you.

3              Then I have nothing more.

4              THE COURT:  First of all, did you have any

5   other questions?

6              MR. McCANN:  I do not Your Honor.  Since I

7   did refer to the photos, I did want to put them in if I

8   could.

9              THE COURT:  That's fine.  Ms. Manuelides, do

10  you have any questions that you want to ask?

11             MS. MANUELIDES:  I would object to that,

12  Your Honor.  I have no idea what possible relevance

13  those photographs have to what is actually before the

14  Court today.

15                  (SPECTATORS SPEAKING.)

16             THE COURT:  Well, I'm going to ask for the

17  reaction to just keep it quiet, please.  They can be

18  marked.  There are all sorts of photos in this file.

19             MR. McCANN:  Thank you.

20             MS. MANUELIDES:  May I see them?

21             MR. McCANN:  ·Sure.  Absolutely.

22             Your Honor, could we mark them 2-A through

23  --

24             THE COURT:  They can be 2-A through E.

25             MR. McCANN:  Thank you.

14:05:41  1              (WHEREUPON, THE EXHIBITS WERE MARKED FOR

2              IDENTIFICATION PURPOSES ONLY AND THE

3              FOLLOWING ENSUED.)

4              MR. McCANN:  I don't have anything else,

5  Your Honor.

6              THE COURT:  Thank you.  You can step down.

7              MS. MANUELIDES:  Can I ask?

8              THE COURT:  I asked if you had any

9  questions.

10             MS. MANUELIDES:  I do have questions.

11             THE COURT:  I thought you said you don't

12  have any questions.

13             MS. MANUELIDES:  No, I do have questions,

14  Your Honor.

15             THE COURT:  All right.

16                      CROSS EXAMINATION

17  BY MS. MANUELIDES:

18     Q.  Briefly, you are aware, are you not -- Mr. Zoll,

19  do you claim that you are familiar with the zoning of

20  the property?

21     A.  The zoning is residential.

22     Q.  But you are not an engineer.  Correct?

23     A.  No, I'm not.

24     Q.  So, your wouldn't consider yourself qualified to

25  opine as to whether or not the addition that we're

14:06:52

1 proposing to move could, in fact, be moved consistent

2 with zoning law, are you?  You talked about setbacks and

3 where it is.  You are not qualified to testify to that,

4 are you?

5     A.  I think I'm qualified as a lay person certainly

6 to testify that the building does not meet the setback

7 requirements for a commercial center.

8     Q.  As a lay person --

9     A.  It is a commercial center and it is required to

10 be setback, my understanding, about fifty feet.  It is

11 now setback -- the whole purpose, of course, of getting

12 the residential permit was to avoid the need to set it

13 back.

14     Q.  So, if Ms. Dopkin has an engineer that says that

15 the building can be moved back consistent with Baltimore

16 County zoning ordinances, you take umbrage with that?

17     A.  You see, that is kind of a misleading question.

18     Q.  It is just a question.

19     A.  Let me respond to it.

20            THE COURT:  Hold on a second.  I need you

21 not to be talking over each other.  Okay?

22            THE WITNESS:  Okay.

23     A.  If he says that he can move the building back and

24 it will be within the zoning -- the fact is now the

25 building is zoned as a residence.  Yes, of course, he

14:08:15   1    can move the residence.

2        Q.  So -- -

3        A.  The problem with that--

4            THE COURT:  Ms. Manuelides, you're cutting

5    her off.

6            MS. MANUELIDES:  She does go on, Your Honor.

7            THE COURT:  You are now doing it again.  If

8    you have an objection, state an objection and I will

9    take care of it.  Go ahead.

10           THE WITNESS:  Thank you.

11       A.  The problem with that is that the permit is a

12   lie.  It is dishonest and has been adjudicated as such.

13   That's the problem and that's the problem with the

14   setbacks.

15       Q.  If I can ask my question.  My question is and if

16   the building is today being used as a residence, then

17   the building is being occupied consistent with the law.

18   If it is today, just hypothetically speaking.

19       A.  No.  I mean, the fact is that the Board of

20   Appeals opinion said that even if they lived in the

21   thing, which they do not as a matter of fact, even if

22   they did, dual occupancy was illegal and they cannot

23   have a commercial center and even if they did live in

24   the building they can't do that.  That is a final

25   opinion which was not appealed and which actually, as

14:09:40   1   you know, Rabbi Rivkin chose not to even participate at

2   the end of.  So, that is it.  I know it bothers you that

3   there is --

4        Q. Excuse me.  You answered the question.

5        A.  I'm sorry.  Okay.

6        Q.  When was the last time that you were inside the

7   structure, ma'am?

8        A.  I have seen pictures the inside.  The pictures of

9   the inside have been posted on Facebook.  I have seen

10  diagrams of the inside which have been presented in

11  evidence at several hearings in this case.

12       Q.  That's not my question.  My question is when was

13  the last time that you were inside and actually were

14  able to see what was in the building and what was not?

15       A.  I personally have not been inside the building.

16       Q.  Thank you.

17       A.  I have seen what is inside the building from

18  photographs however that were posted on Facebook.

19       Q.  So, you don't really know sitting here today that

20  the Rivkins only live in the older structure as opposed

21  to the newer structure, do you?

22       A.  Okay, I do know.  I do know because I observe the

23  building from the outside, the lights.  I observe the

24  boarders coming and going from the outside entrances

25  with their backpacks and picking up their Ubers and so

14:10:57

1  on.  I can see from the diagrams that -- anyway, I can

2  see what is going on.  I can see who lives where and I

3  can see it from the lights.  It would be also the fact

4  that the thing is lit up every light on the entire

5  night.

6      Q.  So, you spend your night watching inside the

7  house?

8      A.  No, I don't.  You know, I do get up occasionally

9  in the middle of the night and I can't help but see the

10  lights.  They also shine into my front bedroom window,

11  those bright lights from that structure now in the front

12  of the property, every light on.  We have French doors

13  from our bedroom to open out onto the porch in the front

14  of our property and oh, yeah, those lights come right

15  into the bedroom every night.  I would have a hard time

16  sleeping there and I'm sure the Rivkin children are not

17  sleeping in such an environment.  I would hope.

18      Q.  You're also not a construction manager, are you

19  not?

20      A.  As you know I'm not.

21      Q.  So, when you talk about that you know that there

22  is asbestos and lead and you are concerned about that,

23  that is just based on your supposition.  It is not based

24  on any training that you have.  Is that correct?

25      A.  No, it is not.  It is based on the fact that it

14:12:18   1    is a 1950's house and houses of that age have lead,

2    asbestos and so on.  There have been a lot of articles

3    in the paper recently about the problems that that

4    causes, not only to the neighbors, but to the

5    environment in general demolishing these old structures.

6    It is something that has to be handled very carefully.

7        Q.   I'll grant you that.  As far as actually putting

8    a structure where they are proposing putting the

9    structure, you are aware that there is nothing that

10    prevents Friends of Lubavitch from demolishing the

11    existing house and putting up a new house as long as it

12    is in compliance with zoning ordinances.  Correct?  They

13    could do that, could they not?

14        A.   I guess they could.

15             MS. MANUELIDES:  I have no further

16    questions.

17             THE COURT:  Anything further?

18             MR. McCANN:  No, Your Honor.  Thank you.

19             THE COURT:  Thank you.  You can step down.

20             THE WITNESS:  Thank you.

21             THE COURT:  Mr. Attachak is still here.  Can

22    I ask him a question?

23             On the option to move the structure, to

24    demolish the existing house and move the structure back,

25    what is the permitting process in order to do that?

14:13:45

1   What would be required.

2           MR. ATTACHAK:   There is a series of four

3   different permits that would be required.   There is a

4   demolition permit needed for the original structure.

5   There is a building permit that would be required for

6   the new foundation for the addition to be moved back.

7   There is a permit in order to move the structure itself.

8   There is a small land disturbance permit if the

9   disturbance is over 5,000 square feet.

10          THE COURT:   You say four permits?

11          MR. ATTACHAK:   Yes.

12          THE COURT:   I only counted three.

13          MR. ATTACHAK:   Demolition permit,

14   construction permit, moving permit, small land

15   disturbance.

16          THE COURT:   Okay.   On the moving permit, is

17   part of any of that -- is part of any of those four

18   permitting processes, is there a substantive review of

19   the structure itself in terms of whether it complies

20   with the zoning for that area?

21          MR. ATTACHAK:   Yes, the building permit

22   would have a zoning process to it and the demolition

23   permit would have a process regarding any issues with

24   asbestos for example.   In terms of the review for the

25   structure, the building permit would.

14:15:00

1    THE COURT:  Pardon my ignorance, but this is

2    not my area.  When you apply for the building permit,

3    what is the process for individuals like the neighbors

4    to contest or to challenge legitimacy of the permits for

5    that structure?

6    MR. ATTACHAK:  Unless there is a variance

7    there is usually no series of -- there is nothing in

8    place for the neighbors to comment on it.  If there is a

9    variance, then there would be a hearing for it.

10   THE COURT:  And if as one would reasonably

11   anticipates there would be an objection as to whether

12   this structure is in compliance, is there any point in

13   the process where there can be a challenge to that?

14   MR. ATTACHAK:  Again, my understanding is

15   only if there is a variance would there be a place where

16   there could be a challenge.  There would actually be a

17   public hearing on it.

18   MR. McCANN:  In fact, I can speak to that,

19   Your Honor.  I do this stuff day in and day out.

20   THE COURT:  Okay.

21   MR. McCANN:  What would happen with the

22   building permit is the application goes to the Permits,

23   Approvals and Inspections and then it is circulated to

24   agencies -- Zoning, Department of the Environment

25   protection -- and they literally just check off on it

14:18:59

1    and they may or may not look at the plans.  In my

2    experience, sometimes they do and sometimes they don't,

3    but those are just plans.  No part of that process

4    involves community input.  In fact, if a building permit

5    is issued, we can't appeal it.  The law does not allow

6    us to appeal the granting of a building permit.  If the

7    building permit is denied, the property owner can appeal

8    the denial, but we can't appeal the granting of a

9    building permit.

10            So, there is nothing in that process that

11   would allow the community to be involved, certainly not

12   a hearing, but even beyond that for the community to be

13   involved.

14            THE COURT:  Thank you.  Got it.

15            MR. McCANN:  Thank you.

16            THE COURT:  Ms. Dopkin, is there anything

17   that you want to add on that?

18            MS. DOPKIN:  Just to concur as to the

19   building permit process.  I do believe the community

20   could challenge the zoning if a variance or some other

21   relief is requested through a zoning petition, but it

22   would not stop the building permit process.

23            So, I think I agree with Mr. McCann.  There

24   is a process, but it is not terribly timely in making a

25   difference whether the permit is issued or not.

14:20:13

1      MR. McCANN:  If a variance is requested.

2      THE COURT:  If no variance is requested, the

3 structure just gets moved back?

4      MR. McCANN:  Exactly.

5      MS. DOPKIN:  And then the community can file

6 a request that the Administrative Law Judge determine

7 whether it complies with zoning after the fact.

8      MR. McCANN:  Can I speak to that?  I file

9 these a lot.  It is called a petition for special

10 hearing and it is the administrative equivalent of a

11 declaratory judgment action.

12      THE COURT:  It would just get you back here

13 in the same way we are now.

14      MR. McCANN:  Exactly.

15      THE COURT:  Three years from now.

16      MS. MANUELIDES:  The point is, Your Honor,

17 that we are contemplating two separate things.  The

18 building itself and whether the building is constructed

19 in compliance with the law, and whether my clients are

20 using the building in compliance with the law.  If they

21 are not using it in compliance with the law, then the

22 remedy is to go back to the zoning board and go through

23 the zoning process.

24      THE COURT:  I get that.  That was the

25 testimony that you wished to present.  Did you wish to

14:21:33

1  present anything?

2          MS. MANUELIDES:  If you want to say

3  something under the same terms that we had Ms. Zoll, if

4  you want to say something, by all means.  If you want to

5  say something, now is your chance.

6          THE COURT:  If we can swear in the witness,

7  please.

8              SHANA RIVKIN,

9  the witness, having been first duly sworn, was examined

10  and testified as follows:

11          THE CLERK:  State you full name and spell

12  your name for the record, please.

13          THE WITNESS:  My name is Shana Rivkin,

14  R-I-V-K-I-N, 14 Aigburth Road, Towson, Maryland 21286.

15              DIRECT EXAMINATION

16          THE WITNESS:  I didn't prepare notes and

17  didn't come with a prepared speech, but I just wanted to

18  have a chance to respond.

19          First of all, I want to start off with

20  saying that we moved to Towson and we have always tried

21  to be good neighbors.  The first Hanukkah we were in

22  town we brought over donuts no our neighbors, including

23  the Zolls.  We were always tried to be respectful.  We

24  teach our kids to be good neighbors and I hope that I'm

25  doing a good job at that.

14:22:46

1          Also, I'm sorry to hear that Ms. Zoll is
2   having such a hard time.  Also, moving it would be so
3   inconvenient.  I just want to say that we're always
4   ready to find mediation or settle and make it not as
5   hard.  I'm not looking to destroy either side of our
6   house, but we were put in a position that we have to
7   kind of do that if we want to try to save our house.
8          As we were saying, Ms. Zoll has never been
9   in my house.  I don't think anybody could come and tell
10  me what is going on in my house.  Our house is used in
11  the back and the front both for my children, our family
12  and students equally.  Our children are all day running
13  around.  I have five children and I'm expecting twins
14  right now.  So, thank God in two months hopefully, not
15  before that, we'll have a family of seven plus
16  ourselves.
17         So, obviously we were not able to keep them
18  staying in that small house that we have.  We have two
19  and a half bedrooms upstairs.  We have, thank God, large
20  families that come to visit us all a the time.  My
21  mother is actually coming from Italy next week to come
22  help me out.  We needed more space.  We, have, thank
23  God, students that come to our house because we believe
24  in our mission and we don't hide what we do.
25         We are there in Towson because we believe

14:24:59

1    that students who are Jewish and find themselves in

2    college in a foreign culture all by themselves

3    surrounded by other ideals and other beliefs should have

4    a place that they could feel at home.

5              It is true that we do host students for

6    Shabbat dinners.  Students know all the time if they

7    break up with their boyfriends, if their pet dies or

8    whatever happens they can come to us and talk.

9              Most of our programs are done on campus both

10   at Goucher and Towson.  My husband and I are there

11   almost daily.  We have classes on campus.  We offer food

12   on campus.  We do tons of things on campus.  We invite

13   students into our home and they are very comfortable and

14   we're happy to see them.

15             The idea that someone sits there and watches

16   the lights in the house is very disturbing.  First of

17   all, if you look outside the back of our house the

18   lights are on 24/7 because that is just how we are.  If

19   you look at my parent's house in Milan, that is how the

20   lights are.  We leave the lights on until we fall

21   asleep.  If we fall asleep on the couch and then we wake

22   up three in the morning, we'll go turn them off.

23   I don't feel like -- I don't know why I'm in court

24   explaining why my lights are on.  Like that is very

25   disturbing.

48

14:26:42

1          My children spend time all over the

2     basement.  It's a large space where students could hang

3     out.  The kids, there is a pool table and my kids spend

4     tons of hours.  There is a big bin with dress up

5     clothes.

6          I don't know why I'm here explaining what is

7     done in my house or not.  If you decide that it is a

8     commercial building, you're welcome to do that, but it

9     is completely residential.  The kitchen is gorgeous.  It

10    has not one piece of stainless steel.  It is true that

11    kosher students who want to keep kosher, it is hard to

12    do that on campus.  We allow them to board upstairs.  We

13    have my family when they come, if there is -- where ever

14    there is space, that's where they stay.  It is very much

15    interchangable.

16          That is some of the things that she

17    mentioned.  I don't remember what else I wanted to

18    respond to.  If you have any questions, you can help me

19    with.

20          MS. MANUELIDES:  I do not.

21          THE WITNESS:  If you have any questions.

22          MR. McCANN:  May I?

23          THE COURT:  Do you have any questions that

24    you want to ask?

25          MR. McCANN:  I do, Your Honor.

14:28:10

CROSS EXAMINATION

BU MR. McCANN:

Q.   Good afternoon by the way.

A.   Hi.

Q.   You said that the structure is completely residential.  Do you actually understand that everything that you just described, all of the activities with the students has been declared illegal by the Board of Appeals?

A.   It has not been declared illegal by the Board of Appeals.

Q.   All right.  That's your understanding?

A.   That is our understanding.  They never gave us guidelines that you are not allowed to have this amount of people for Shabbat dinner.  Everything we do is residential.  They come to my house and it is not commercial.  It is my house.  That is where I live.  It is on the fringe of the college because (inaudible).  That is what my grandparents did after the Holocaust.  They were sent back from America to Italy and they opened a Shabbat Center there.  They wanted a Jewish school for the past fifty years.  My other grandparents moved to Baltimore and opened a center there.  It was in their house.  That is what all of my sister-in-laws and brother-in-laws do, we run Shabbat centers.  It is in

14:33:20

1  our house.  Some of them have a separate space.  Our's

2  is on campus so it happens to be that we do everything

3  together, but I have nothing to do with a commercial

4  operation.  It is our family.  That's what we do.  My

5  kids are part of it just as much as us.

6       Q.  Just to follow-up on that point and then I'll

7  move an.  All of these properties that you have

8  described where these Shabbats are being operated, do

9  you know the zoning of any of those properties?

10            THE COURT:  That's not an appropriate

11  question because I don't think it is appropriate to

12  argue the zoning issue with her.

13            MR. McCANN:  Okay.

14            THE COURT:  Just like if it wasn't

15  appropriate for Ms. Zoll to talk about fees and all.  In

16  terms of the impact on them or how they use, that is

17  fair game for this, but we're not debating the

18  legalities with her.

19            THE WITNESS:  I just want to say one more

20  thing.  Actually it is something that is very important

21  that I forgot to mention.  When we started this process,

22  I know many people just go ahead and do construction and

23  go ahead.  My husband spent two years meeting with the

24  association of the neighborhood and trying to find ways

25  to make everybody happy.  There are certain things that

14:34:55

1    certain neighbors who were friendly asked us and we

2    completely complied with it.  Right now we feel we're in

3    a position that after we tried so hard going out of our

4    way -- I'm really mad that you would call my house a

5    monstrosity because we spent much more money putting

6    bricks.  You walk down the street and it is a beautiful,

7    beautiful home and I really hope that nobody thinks it

8    is a monstrosity.  I don't know why you would say that.

9    BY MR. McCANN:

10   Q.   Let's move on.  I have just one more question.

11   The existing house, the house that you lived in with

12   your family --

13   A.   They are both existing right now thank God.

14   Q.   I mean the original house.

15            THE COURT:  The pre-existing house.

16            MR. McCANN:  Thank you, Your Honor.

17   Q.   That has two and a half bedrooms you said.

18   Right?

19   A.   Upstairs.  There is one more bedroom downstairs.

20   Q.   You could very easily put an addition on that

21   house.  Correct?

22   A.   Not very easily --

23            A SPECTATOR:  You did.

24            THE WITNESS:  He means on the other side.

25   Q.   Just you could.

14:36:05

1    A.   We did actually.   He is right.

2              MR. McCANN:   Nothing else, Your Honor.

3    Thank you.

4              THE WITNESS:   I want to screen people on

5    that part of the house.

6              THE COURT:   Thank you.

7              MS. MANUELIDES:   Thank you.

8              THE COURT:   Anything else from anyone?

9              MR. McCANN:   No, Your Honor.   Thank you.

10             THE COURT:   Can I just reiterate what I can

11   and can't do in the context of where we are right now?

12   Some of this will parallel some comments I made at the

13   beginning of this case.

14             I didn't hear the trial in this case.   It

15   was in front of Judge Souder.   Judge Souder heard the

16   evidence.   Judge Souder made the decision.   Judge Souder

17   rendered that decision and that's currently on appeal.

18   The only piece of this that I have is in terms of moving

19   forward there is an existing order that has to be

20   complied with.   There was a request to stay that and it

21   was denied by Judge Souder.   It was denied by the Court

22   of Special Appeals.   That was not my decision and it is

23   not in my purview to be able to sort of decide that

24   should have been handled differently.

25             It is to me a little ironic that the case

14:38:04

1  was argued on the merits yesterday, that there is an

2  appeal pending on the decision to deny the stay that

3  hasn't yet been scheduled and we're talking about a

4  construction schedule.

5          It is also of concern to me that it is as

6  clear as day that no matter what I rule right now there

7  will be another appeal and another dispute between

8  neighbors.  That is incredibly costly.  If I say that

9  the structure can be moved, I can guarantee you that is

10  getting appealed.  If I say that the structure has to be

11  razed or demolished, the likelihood is that that is

12  getting appealed, too.

13          I mean, you all are locked in this battle

14  that I think procedurally is in a posture that doesn't

15  serve either side well.  So, it is of concern to me.  I

16  have suggested before that the case be mediated.  I hear

17  both sides have incredibly legitimate concerns that to

18  me could be accommodated in certain ways by limiting the

19  activities on the property and deciding what to move or

20  how to move it or what changes should be made to

21  existing structures.  I think there are ways that this

22  could be resolved and compromised.

23          The bottom line though is I think that there

24  is a sense of tremendous frustration probably on both

25  sides.  Some of it is unavoidable.  No matter what,

54

14:39:49

1   there is going to be a structure on that property that

2   the Zolls would probably prefer not be there, but you

3   only have limited ability to control what people do when

4   they renovate or change structures on properties.  So,

5   even if they are completely successful, you may end up

6   with construction there that is more objectionable than

7   what we're talking about right now.

8           You know, I will rule on what is in front of

9   me.  I am concerned about the prospect of allowing a

10   structure to be moved that may not be in compliance with

11   what is the limitations of that neighborhood.

12           On the other hand, Judge Souder said remove,

13   not raze, destroy and I'm stuck with the language of her

14   order.  So, I know that I'm a late comer to this lawsuit

15   and I can't change rulings that have come before me, I

16   can only rule on the stuff that is here going forward.

17           I would again urge people to consider a

18   mediation option.  The other thing that I would urge

19   both of you, both sides to think about is I think the

20   arguments are very different once the Court of Special

21   Appeals rules on the appeal that is pending.  So, while

22   there is some urgency to get a decision, people may be

23   better served, particularly since argument has already

24   occurred, waiting for that decision.

25           So, I will allow you an opportunity to

14:41:46  1 | respond to the motion that you received today.

2 |          MS. MANUELIDES:  Thank you, Your Honor.

3 |          THE COURT:  I will rule on it once I get the

4 | response.  Anything further that we can accomplish

5 | today?

6 |          MS. DOPKIN:  I would only ask that you rule

7 | on paying Mr. Attachak in the meantime.

8 |          THE COURT:  Does anybody have any objection

9 | to that?

10 |          MR. McCANN:  No, Your Honor.

11 |          MS. MANUELIDES:  No.

12 |          THE COURT:  Certainly Mr. Attachak has

13 | advanced the ball substantially in a way that benefits

14 | all sides.  So, I will grant that part of the petition.

15 |          MS. DOPKIN:  Thank you.

16 |          THE COURT:  Thank you all.

17 |          MR. McCANN:  Thank you, judge.

18 |

19 |          (PROCEEDINGS CONCLUDED.)

20 |                  -oOo-

21 |

22 |

23 |

24 |

25 |

1    STATE OF MARYLAND      //

2    COUNTY OF BALTIMORE    //

3

4           I, Steven D. Perrine, Official Court

5    Reporter for the State of Maryland, do hereby certify

6    that I recorded stenographically from a recording the

7    proceedings in ROBIN ZOLL, et al. Vs. FRIENDS OF

8    LUBAVITCH, INC., case number 03-C-16-008420, in the

9    Circuit Court for Baltimore County on September 5th,

10   2018.

11          I further certify that the foregoing pages

12   constitute the official transcript of the proceedings as

13   transcribed by me from a recording to the within

14   typewritten matter in a complete and accurate manner to

15   the best of my ability.

16          In Witness Whereof, I have hereunto

17   subscribed my name and signature this December 5th,

18   2018.

19

20

21                              STEVEN D. PERRINE

22                              Official Court Reporter

23

24

25