# EXHIBIT H

| | |
|---|---|
| IN THE MATTER OF | *     BEFORE THE |
| FRIENDS OF LUBAVITCH, INC. – LEGAL OWNER | |
| DAVID ZOLL, ET AL – PETITIONERS | *     BOARD OF APPEALS |
| FOR SPECIAL HEARING ON THE PROPERTY | |
| LOCATED AT 14 AIGBURTH ROAD | *     OF |
| 9th ELECTION DISTRICT | |
| 5th COUNCILMANIC DISTRICT | *     BALTIMORE COUNTY |
| | *     Case Nos. 16-308-SPH |

    *     *     *     *     *     *     *     *     *     *     *

## O P I N I O N

This matter comes before the Board as a *de novo* appeal from a decision by

Administrative Law Judge John Beverungen, dismissing the Petition.

I.     **PROCEDURAL HISTORY**

Friends of Lubavitch, Inc. ("Lubavitch") is associated with the Orthodox branch of

Judaism. Its primary focus is outreach to Jews who have never actively practiced their faith or who

have drifted away from the practice of Judaism. Lubavitch oftentimes focuses its attention on

college campuses.

The property in question – 14 Aigburth Road, Towson, Maryland 21286 – is owned by

Lubavitch. Rabbi Menachem Rivkin is associated with the Lubavitch organization. In 2008,

Rabbi Rivkin, on behalf of the Friends of Lubavitch, approached the homeowners in the unit block

of Aigburth Road in Towson looking for a home to buy. He was intending to use it as a base to

reach out to, and interact with, the Jewish students at Towson University and Goucher College.

This location was within walking distance of those two schools. The owner at 14 Aigburth Road

agreed to sell. Friends of Lubavitch is the title owner. The subject property was then a three

bedroom home with an office outfitted to serve as a spare bedroom if necessary. The subject

property is zoned D.R. 5.5 (Density Residential).  At the time of the purchase, Rabbi and Mrs. Rivkin had only one child.  They now have five children.

According to Rabbi Rivkin, he always intended to enlarge the house as his family grew. In 2014, Rabbi Rivkin announced that it (Lubavitch) was going to expand the existing building on the subject property, and it applied for a building permit in order to construct what was specifically described as a "parsonage".  It submitted an architectural plan that reflected a parsonage that was approximately 7,000 square feet.

Lubavitch filed a Petition for Special Hearing denoted as 15-223-SPH in which it sought permission to construct the parsonage. The matter was referred to the Baltimore County Department of Planning, Development Review Division.  The submission was reviewed by Lloyd Moxley.  He determined that a parsonage could not be constructed unless a special exception was granted.  Additionally, in that neighborhood, any non-residential buildings, including parsonages, needed to comply with the Residential Transition Area (RTA) requirements which establish buffers when placing a commercial or institutional building in or near an established residential area. There was no special exception and, as acknowledged by all parties, the RTA could never be satisfied in this matter. The County recommended that the Petition be denied and by order dated June 25, 2015, Judge Beverungen denied the request.[1]  That matter was not appealed.

In 2016, the same plans were re-submitted, but instead of being designated a "parsonage", it was then being called merely a residential addition to the existing home.  Because there was no actual difference between the parsonage plans and the now designated home expansion plans, the Department of Planning, which reviews building plans, was skeptical.  It suggested to Rabbi

---

[1]    Lubavitch filed a Motion to Reconsider which Judge Beverungen denied on August 10, 2015.

Rivkin that he file a Petition for a Special Hearing seeking permission to construct a single family residential addition to be used by the family. Accordingly, Friends of Lubavitch, as the title holder of the property, filed precisely such a Petition. It was numbered as 16-170-SPH ("Lubavitch Petition"). Essentially, it sought a declaration that it was proper to construct a residential addition to the existing home.

In the meantime, other residents of Aigburth and the local community association became concerned about the possible expansion on the subject property. In particular, there was an article in the *Towson Times* which quoted Rabbi Rivkin describing the intended uses for the addition which appeared to be far more akin to a community center than a personal residence. Even more, the *Towson Times* included a picture – provided by Rabbi Rivkin -- of a different Lubavitch structure quite similar to the one planned for Aigburth Road. The picture showed an institutional looking building bearing little resemblance to any typical residence, and was virtually identical to the plans of the earlier unpermitted parsonage.[2] Discussions with Rabbi Rivkin yielded nothing meaningful. The neighbors began filing complaints with the County Code Enforcement. Citations were issued but went nowhere. Finally, a number of the residents filed their own request for a Special Hearing. That Petition ("Neighborhood" or "Protestants" Petition) – 16-308-SPH – sought a declaration as to the current use of the property; whether the current use violated a number of

---

[2]      The fact that Rabbi Rivkin could produce a picture of another Chabad House that was essentially the same as the new structure intended for this site certainly supports the conclusion that for the most part Lubavitch was relying on pre-prepared plans that had been used in other places for Chabad House construction. The physical similarity between this building and the other buildings which are far more than residences for rabbis leads to the conclusion that this building is intended to be far more than a residence for a rabbi.

zoning regulations, and whether the new structure needed to comply with the setbacks required for a community center. The two Petitions were consolidated for hearing before Judge Beverungen.

In the testimony before Judge Beverungen Rabbi Rivkin testified, essentially, that the planned building was simply an addition to his existing house. The community presented evidence that the use as a residential addition was a subterfuge designed to actually construct a community center. Judge Beverungen found that the questions were ultimately questions of use which could only be resolved once the new building was built. Because the structure had not yet been built and the activities had not yet occurred, he dismissed the neighborhood petition as premature. In his view, any use by Lubavitch that exceeded the scope of residential use could only be addressed through citations and zoning violation hearings. Further, he ruled that a residential addition was permitted by right (which it is) in the D.R. 5.5 zone. Accordingly, he found that Lubavitch could construct a residential addition. His order dismissing Protestants' Petition was issued on April 6 and reconfirmed in an order denying a motion for reconsideration on May 25, 2016. His order permitting the Lubavitch construction as a residential addition is dated July 25, 2016. Each side appealed to the Board of Appeals (CBA). People's Counsel also joined the CBA action. In the meantime, Lubavitch filed for and received a building work permit. It immediately began construction.[3]

On October 27, 2016, The Board held a *de novo* hearing. Timothy Kotroco, Esquire represented Friends of Lubavitch, Inc. Brian J. Murphy, Esquire represented David Zoll, Robin Zoll, Trustee of the Madge and James Taylor Trust, Aigburth Manor Association, Inc., Paul

---

[3]     Judge Beverungen's order contained the standard cautionary language regarding the 30 day appeals period and stated: "[i]f for whatever reason this Order is reversed, Petitioner would be required to return the subject property to its original condition".

4

Hartman, Wanda Cambs, Timothy and Lyn Phelps, Preston and Kristin Schultze, Diana and Donald Dagati, Thomas and Lisa Kelly, Richard and Brenda Ames-Ledbetter, Salley Malena, Howard Taylor, Flo Newman, Devin Leary, and Alexis Rohde, collectively referred to as the Protestants.

Lubavitch began its case, calling a surveyor who testified in general about the size and scope of the structure. It also called Rabbi Rivkin who went through his direct testimony and had completed part of cross examination when it was necessary to adjourn the hearing for the day. The parties agreed upon January 12, 2017, as the date to resume testimony.[4] Counsel for the Protestants issued a subpoena served on Lubavitch counsel, to require Rabbi Rivkin to testify at the January 12, 2017, hearing.

On January 11, 2017, counsel for Lubavitch filed a notice dismissing the Lubavitch Petition (16-170-SPH) and striking his appearance for Lubavitch as respondent in the Protestants' Petition (16-308-SPH). An Order of Dismissal was issued on January 17, 2017 in case number 16-170-SPH.

On January 12, the second day of hearings occurred. The Protestants and People's Counsel had planned to further examine Rabbi Rivkin, but Rabbi Rivkin failed to appear. The hearing proceeded with the Protestants and People's Counsel calling its witnesses, and concluded that day. The CBA requested briefing from the parties, and it was determined that they would submit their Closing Memoranda on February 27, 2017, with public deliberation set for March 23, 2017. Protestants and People's Counsel submitted their Memoranda in accord with the schedule.

---

[4]     The parties anticipated extensive testimony. Accordingly, the CBA, in consultation with all counsel, scheduled additional hearing dates of February 23 and March 7, 2017

Also on February 27, 2017, Rabbi Rivkin hand delivered a letter from a Washington, D.C. attorney whose appearance was not in the case and who was not seeking to enter the case. The letter was addressed to Rabbi Rivkin and not the CBA. The letter contained a number of factual assertions and conclusions which appeared to be from Rabbi Rivkin who had not responded to the subpoena to testify. Consequently, these factual assertions were untested and largely self-serving. The letter indicated to Rabbi Rivkin that if the CBA ruled in favor of the neighborhood, that firm would file an action against the CBA and Baltimore County alleging a violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. Sections 2000cc, et seq. ("RLUIPA"). RLUIPA had not been an issue raised in either Petition.

On March 23, 2017, the CBA held its public deliberation. The three Board members unanimously agreed that the Protestants had carried their burden of proof, that Rabbi Rivkin's testimony was not particularly credible on contested points, and that his demeanor had been dismissive towards his neighbors and truculent in general. The CBA found that the neighborhood witnesses, particularly Robin Zoll, were quite credible. The only disagreement among the Board members related to the nature of a ruling at this stage. One Board member believed, as had Judge Beverungen, that the matter was not yet ripe because Lubavitch had not yet actually used the new structure as a Chabad House. This Board member believed that only if the use of the building upon completion went beyond the scope of a residence, could the authorities intervene by way of a violation notice. The matter would then be resolved pursuant to the procedures established for resolving citations.

The majority found that the totality of all the evidence demonstrated that Lubavitch had acted in bad faith; that there was little question, based on the record, that even before the new building, Lubavitch had been acting as community center at 14 Aigburth; that the only genuine

primary purpose of the new structure was to enhance the Lubavitch community center presence and activities; and that the claim that this was simply an addition to a residence was not credible. Accordingly the CBA ruled, 2 to 1, in favor of the Protestants in Case No. 16-308-SPH.

## II. FACTUAL ANALYSIS

The first day of testimony was October 27, 2016, and was the only day in which all of the parties participated. At issue were both the Protestants' petition and the Lubavitch petition. People's Counsel had joined the matter on the side of the community. There was time for only one full and one partial witnesses. Scott Dallas, a surveyor and expert in County zoning, was the first witness. Through him it was established that Lubavitch had earlier requested a work permit to build a parsonage. That permit had been denied because it could not be built without a special exception and without satisfying the RTA requirements. Consequently, Lubavitch submitted a second request for a work permit to build a residential addition. Through Dallas, it was established that the footprint for the second request was exactly the same as for the parsonage. He claimed that he was not familiar with the architectural plans, so he purported not to know if there were any differences to the interior of the building in that plan as opposed to the earlier parsonage plan. It turned out that there were no significant differences. As of that hearing, the building was largely completed.

The second witness was Rabbi Rivkin. Rabbi Rivkin testified extensively on direct. He was being cross examined by Protestants counsel when the matter was adjourned for the day. The matter reconvened on January 12, 2017. As indicated above, Lubavitch had the day before dismissed its Petition, and counsel for Lubavitch had withdrawn from the case involving Protestants' Petition. No one, including Rabbi Rivkin, appeared on behalf of Lubavitch. It was established that Protestants' counsel had validly served a subpoena on Rabbi Rivkin through

counsel prior to counsel's withdrawal from the case.[5]  It was determined that the matter would proceed with Protestants' and People's Counsel's case.

The Protestants called a number of witnesses: Lloyd Moxley of the Baltimore County Department of Planning, Paul Hartman, a neighborhood resident and President of the Aigburth Community Association, Devin Leary, another neighbor and a landscape architect, and Robin Zoll, a retired attorney who resides at the adjoining residence at 16 Aigburth.  A great number of documents were also introduced.[6]

## A.  The Building Itself

The size and scope of the structure undermines any claim that it is merely a residence for the use of Rabbi Rivkin, his family, and some of their "friends", as he so testified.  The original house, set back from the road, was variously described as a one and a half story, two to three bedroom home, approximately 2200 square feet.  The addition, on the other hand, is between 6,000 and 7,000 square feet.  Together, the "home" went from about 2200 square feet to close to 9,000

---

[5]     Counsel had attempted to also serve Rabbi Rivkin by registered mail, but the mailing was refused.

[6]     A finder of fact is not obliged to take every assertion uttered by a witness at face value.  It is a black letter principle that the factfinder can accept some, all, or none of a witness' testimony, depending upon how that testimony fits with other testimony and how the credibility of that witness influences the believability of the testimony.  In this matter, the CBA has largely accepted the testimony of the Protestants.  It does so because the Protestants' witnesses were mutually corroborating, the exhibits clearly supported that testimony, the objective circumstances surrounding the case (including the very nature of the building at issue) confirmed the testimony, much of Rabbi Rivkin's testimony appeared to be coy and disingenuous given all of the objective circumstances, the demeanor of all of Protestants' witnesses was straight forward, and finally, Rabbi Rivkin's demeanor at the portion of the hearing in which he participated was self-interested and combative.  The CBA could draw an adverse inference regarding Rabbi Rivkin's testimony by what would appear to be his willful failure to appear at the continued hearing to resume cross examination.  While noting Rabbi Rivkin's absence, the CBA does not view it necessary to make any adverse finding based solely on his failure to appear, and specifically does not.  His absence and the absence of counsel or of any other representative does mean that Lubavitch made no effort to challenge the testimony of the Protestants' witnesses.  That it did at its own risk.  It is difficult to complain about factual conclusions that one did not bother to contest.

square feet. The addition is simply attached to the pre-existing house by a covered breezeway. There was no effort made by design to integrate the addition with the pre-existing house.

The building is a two story building with a basement, though the basement is partially above grade and so it gives the impression of, and is often referred to as, being a three story building. The design of the building is institutional, not residential. It looks like a community center. It is about seven feet higher than the neighboring three story home. It is quite improbable that a private religious organization would spend approximately $3,000,000 -- much of which was raised by private donations -- to construct a home for one of its rabbis to simply live in without the expectation that that building, designed as it is, will be used for the primary support of the Lubavitch mission.

Because Rabbi Rivkin did not appear for the continuation of his cross examination, the description of the interior is largely limited to information that Rabbi Rivkin provided to newspapers and information that he gave to the neighbors in conversations. The first floor has a dining room that can seat over 120.[7] Instead of a closet, there is a cloak room. There are men's and women's powder rooms. The kitchen appears to be commercially outfitted and is far larger than necessary to serve a family of seven and their "friends". According to the *Jewish Times* in its report on the groundbreaking ceremonies, the new building will have a library, conference room, synagogue, and a student lounge. Most significantly, there are two apartments on the second floor which have outside entrances. Rabbi Rivkin told at least two members of the community that one of the apartments would be for visitors, while the other would be for a person characterized

---

[7]     There was evidence that the Rivkins ran out of space for all those who wanted to attend Shabbat dinners at the pre-existing house.

variously as a "caretaker" or "staff person". This all supports the conclusion that the building had always been intended to be a community center and not a residence.

In effect, this is a 9,000 square foot institutional-looking structure in a residential neighborhood of 3,000 square foot homes. As one witness noted, it is unimaginable that a normal home buyer would ever dream of purchasing this so-called house were Lubavitch to decide to sell it.

## B. The Public Message

Lubavitch is engaged in outreach efforts. Consequently, it is important that it have a public presence and a public voice. And it is important that the message conveyed to the public is accurate. The house at 14 Aigburth has had a sign posted in its front yard for years identifying it as "Chabad". There was substantial testimony from the residents as well as from Rabbi Rivkin about website and Facebook descriptions of the various types of Lubavitch-sponsored activity. Rabbi Rivkin tended to minimize these postings. He seemed to suggest that these were trivial notices upon which no one could rely and which had little actual impact on the day-to-day activities. Yet the postings continued, and their continuation is strong evidence that they were true and meant to be taken seriously. Many of the dinners and holiday celebrations involved open invitations to hundreds of people. If only 50 or 20 or 10 happened to show up at any given event, it was not because of a failure to advertise. It is true enough that some of the activities were scheduled to take place on the Towson University campus. It is equally true that the Chabad House at 14 Aigburth had at least as strong a presence as did the campus location **before** the new structure. It is more than reasonable to infer that once the Chabad House on Aigburth is able to accommodate more and larger attendance, more and more of the campus based activities will be spun off to the Chabad House. It is obviously a more pleasant and conducive physical environment than some

sterile campus activity room.  The fact of a large Kosher kitchen with Kosher pots and pans, cooking utensils, dishes and cutlery means that any activity involving food is vastly simpler and preferable at 14 Aigburth.

### C. The Activities At The Location

As indicated above, there is a sign that reads "Chabad" that is posted at the front of the property near the sidewalk.  It has been there almost from the beginning of Rabbi Rivkin's residence in 2008, and has continued through the present.  According to Wikipedia, Chabad Houses are ". . . Jewish community centers that provide educational and outreach activities serving the needs of the entire Jewish community. . .".  As in this case, they are often located near college campuses where the intention is to provide ". . . housing for students, peer counseling and drug prevention centers, student activity offices, a synagogue, library, kosher dining hall, student lounges, and a computer area."  There was testimony that Rabbi Rivkin specifically told area residents about some of these anticipated uses when the plan was to build a parsonage.  He specifically indicated that the new building would serve as a synagogue.  And again, it is illogical to believe that Lubavitch would make an enormous financial commitment for a structure that was previously identified publicly as a Chabad House, all with the intention of merely using that structure as a home for a rabbi.

The *Jewish Times* reported on the groundbreaking ceremonies. That article gives full breadth to the fact that the new building is intended as a community center.  Present were a host of university and county officials, longtime friends of Rabbi Rivkin, and individuals involved with other Chabad Houses, all of whom spoke glowingly about the new building as a community center.  Rabbi Rivkin's wife is quoted as saying that the new building "will allow for more programs at varying times."

There was substantial testimony about community center activities even before the new structure. There were regular noise complaints, parking problems and trash removal issues. Aigburth Road, for example, has limited residential permit parking. That parking was often taken up by Chabad House visitors and was thereby unavailable to the residents and their guests. There was testimony about not infrequently seeing ten bags of trash set out for normal pickup. As one witness noted, this is precisely why commercial and other non-residential sites typically are required to have dumpsters. There were also complaints about chronic unbagged trash.

The tax documents introduced into evidence listed 14 Aigburth as a "Jewish Student Center". The fact that the property is tax exempt is not itself probative as to whether the property is a community center. If 14 Aigburth was a property owned by Lubavitch and used purely and simply as a residence for Rabbi Rivkin, it is probably tax exempt as property owned by a religious body and not used for a profit making activity. So, while tax exempt status does not **directly** assist in the analysis, the fact that the tax document identifies the property as a "student center" is hugely probative as to the actual and intended use. Lubavitch would not submit false information to the taxing authorities on such a central matter.

Thus, it is clear that before the new structure, the smallish house at 14 Aigburth was operating as a community center. Those pre-construction community center activities were limited only by the size of the then existing house. It is naïve to think that those activities would not increase dramatically in relation to what the new structure can accommodate.

### D. Robin Zoll

One of the most compelling witnesses was Robin Zoll who lives at 18 Aigburth. She and her husband have lived there in excess of thirty years, and they have experienced many of the obnoxious side effects of the pre-construction community center activity. Nonetheless, it was clear

from her testimony that she and her husband were willing to tolerate the relatively low level activity involving noise, trash, and parking. It was only when Rabbi Rivkin unveiled the plans for a parsonage with its massive construction project that she began to take steps to protect her property. On the administrative side, her efforts along with those of the community at large have been largely, and sadly, ineffective. Notwithstanding grave misgivings on the part of Baltimore County government that the project was really a parsonage/community center camouflaged by using the word "addition", Baltimore County issued the building permit. It is probably the case that no one in officialdom actually believed that those new plans, which called for a structure virtually identical to the rejected parsonage, were for a mere residential addition designed to help Rabbi Rivkin's burgeoning family. And while it is reasonable to believe that few in county government believed the Lubavitch claim, no one in county government felt empowered to take steps to block construction. It was a construction permit strategy relying upon a county administration that viewed itself as hamstrung and powerless to acknowledge out loud what everyone believed to be the case. Undoubtedly, they held out the faint hope that Lubavitch was acting in good faith. When Mrs. Zoll confronted Rabbi Rivkin with his having obtained the work permit by deceit, his response was: "I was as honest as I could be to get my permit". This was a stunning admission.

By the time of the January 12, 2017, hearing, the structure was essentially complete. Though activities had not yet commenced, the very size of the building loomed over the Zoll property. It blocks the views from her porch, and she described it as "like living next to the Y". These are aesthetic complaints that are real, valid, and meaningful. Even more, however, is that the County took the step, unprecedented in most people's experience, of **reducing** the value of her property for tax assessment purposes. The value went from approximately $408,000 to $341,500,

13

and that value reduction was done largely because of the Lubavitch construction. The reduction was because of "economic obsolescence" occasioned by a newly constructed religious center that blocked her property. This tax reduction is strong evidence that this was not merely some neighborhood squabble concerning appearances or day-to-day annoyances between people that have trouble co-existing. This was the construction of a huge institutional building in a residential neighborhood with a dishonestly procured permit,[9] occasioned by official frustration in the face of what everyone must have known to be the case, and that has now resulted in measureable diminution of property values.[10]

## III. THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT (RLUIPA)

The question of the applicability of RLUIPA has faintly hovered over this matter. There were some brief references to it by counsel in the January 12, 2017, hearing, and as indicated above, Rabbi Rivkin delivered an unsigned letter from a Washington D.C. law firm threatening

---

[9]     Unbeknownst to the CBA, on the day of its public deliberation, a circuit court action commenced in *Robin Zoll, et al v. Friends of Lubavitch, Inc.*, Circuit Court for Baltimore County, Case No. C-16-8420. The core allegation in that case was that Lubavitch violated the setback covenant contained in the deed when it purchased 14 Aigburth. The new structure violates that covenant. Ultimately, on April 7, 2017, the Circuit Court ordered Lubavitch to remove any part of the structure that is in violation of that covenant.

Interestingly, the Circuit Court echoed many of the same findings made by the CBA in its public deliberation. The Court opinion notes the 30 to 50 friends which visit the home for dinners on most Friday evenings, for the High Holy Days, and for every other Jewish holiday. It notes Rabbi Rivkin sending out 250 invitations for events at the house. Clearly the Circuit Court was suspicious of Rabbi Rivkin's blithe claim that the use of the structure -- a use that had been going on since 2008 – was simply residential, though resolution of that issue was not relevant to the Circuit Court case. Additionally, the Court, like the CBA, noted that Rabbi Rivkin's demeanor as a witness led to the conclusion that, where in conflict, credibility questions were to be resolved in favor of the neighbors. The Court described his demeanor as "evasive and aggressive".

[10]     The value of the property at 12 Aigburth is probably similarly affected. Any adverse impact there, however, is irrelevant because that property, and one other in that block of Aigburth, are owned personally by Rabbi Rivkin.

action under RLUIPA should the CBA decision be adverse to Lubavitch.  Though RLUIPA was not raised nor litigated by Lubavitch in any aspect of the case until well after the testimony and exhibits had been received and well after it had withdrawn from the two pending cases, it is useful to give it brief mention.

First, Lubavitch opted out of the administrative process.  By dismissing its own Petition and electing to not participate in the related neighborhood Petition, Lubavitch has most likely waived any claim it might have under RLUIPA.  Even looking at the extent to which Lubavitch did participate, it did not raise the issue or seek a zoning accommodation under RLUIPA.  Thus it did not avail itself of the administrative process through which accommodations could be made.

Secondly, Lubavitch has never claimed that it was prevented from constructing a community center because the RTA and the special exception process restricted its free practice of religion.  On the contrary, Lubavitch has maintained (at least following the adverse resolution of the parsonage question), that the new structure is simply a residence without any wider significance.  In the face of County and community skepticism, Lubavitch has steadfastly insisted that it was seeking only a residential addition in accordance with all of the established zoning requisites.  The CBA in this opinion has found the Lubavitch claim to be disingenuous, but that does not change the nature of the Lubavitch position.  Lubavitch did not seek permission to establish a community center so it cannot now complain that its failure to obtain zoning approval for a community center somehow violates RLUIPA.

## CONCLUSION

There is a unanimous finding by the CBA that Lubavitch has been acting as a community center. It has been doing so apparently since soon after Rabbi Rivkin moved to 14 Aigburth. The scope of those activities has grown over time. There was a certain natural limitation on the level

of activities because of the limited size of the house. As Rabbi Rivkin has become more and more successful in his outreach efforts, the activities have grown larger than the physical plant can usefully accommodate. Like most people of goodwill, his neighbors tolerated the activities until it was announced that Lubavitch was going to expand the size of the structure with the corresponding natural expansion of its activities. At that point, the neighbors attempted to block the dramatic alteration of the neighborhood. They called upon County administrative resources in every reasonable way but without any ultimate success. Though the County was not without sympathy, its view of its authority as limited in these circumstances has resulted in a huge institutional building at the site. This building, with its promise of greatly increased activity, represents a significant erosion of the neighborhood as it has traditionally been. Lubavitch has asserted that its use of the original house and now with its new addition has been as a residence with modest accessory residential uses involving student meetings, dinners, and holiday programs. Its description of its level of activity has been coy and insincere. The Protestants believe what they have seen; not what they have been told. Sadly, Lubavitch has achieved its goals by manipulating both the administrative system as well as everyone's natural inclination to defer to religious organizations. In the end, Lubavitch has left the CBA with very few options, but leaving the neighbors stranded cannot be one of them.

While Lubavitch and Rabbi Rivkin have the right to use 14 Aigburth as a dwelling, the credible evidence has established that it has been and is intended in the future to be used as both a dwelling and as a community center. That latter use requires a special exception and compliance with the RTA requirements, neither of which has been done. The CBA believes that Lubavitch has acted in bad faith in obtaining the building permit and constructing the addition. The CBA does not believe that it has the power or authority to order the removal of the building. All that it can

do is grant the Protestants' Petition in the form of declaratory judgment.  *See* BCZR Section 500.7 and *Antwerpen v. Baltimore County*, 163 Md. App. 194, 209 (2005) ("A request for a special hearing is, in effect, a request for a declaratory judgment.").

**O R D E R**

THEREFORE, IT IS THIS  5<u>th</u>  day of  *September* , 2017, the Board of Appeals of Baltimore County hereby

ORDERED that, in accordance with the conclusions herein, the use of the property at 14 Aigburth Road by Friends of Lubavitch has exceeded the use compatible with that of a residential property; that the property has assumed the dual status of a residence and a community center by consistently hosting events advertised to hundreds of people and attended by scores, and by acting as an outreach center to college students; and it is further

ORDERED that Friends of Lubavitch is and has been using the property at 14 Aigburth Road as a community center without having obtained the necessary approvals or complying with the necessary regulations, including the Residential Transition Area requirements.

Any petition for judicial review from this decision must be made in accordance with Rule 7-201 through Rule 7-210 of the *Maryland Rules*.

BOARD OF APPEALS
OF BALTIMORE COUNTY


_____
Joseph L. Evans


_____
Meryl W. Rosen

IN THE MATTER OF                                    *        BEFORE THE
FRIENDS OF LUBAVITCH, INC. – LEGAL OWNER
DAVID ZOLL, ET AL – PETITIONERS                     *        BOARD OF APPEALS
FOR SPECIAL HEARING ON THE PROPERTY
LOCATED AT 14 AIGBURTH ROAD                         *        OF
9th ELECTION DISTRICT
5th COUNCILMANIC DISTRICT                           *        BALTIMORE COUNTY

                                                    *        Case Nos.  16-308-SPH

        *       *       *       *       *       *       *       *       *       *       *

## DISSENT

        The property at issue in this case – 14 Aigburth Road, Towson, Maryland 21286 (the "Property") – originally contained a modest, three-bedroom, single family home at the time of its purchase by Friends of Lubavitch Inc. in 2008. Since the purchase of the Property by Friends of Lubavitch Inc., Rabbi Menachem Rivkin has resided in the Property with his family and used the Property to host outreach activities for Jewish students at Towson University and Goucher College.

        In 2016, Rabbi Rivkin applied for – and received approval – for a permit to construct a 7,000 square foot addition to the Property. The vexing question in this case is whether the Property, including the newly constructed addition, (a) is for the residential use of the Property by Rabbi Rivkin, his wife, and five children as allowed by right in a D.R. 5.5 zone, or (b) serves as a community center for outreach activities catering to Jewish students at Towson University and Goucher College that would require compliance with the Residential Transition Area regulations in the Baltimore County Zoning Regulations. *See* B.C.Z.R. § 1B01.1.B. During his unfinished testimony, Rabbi Rivkin vehemently asserted that the addition constructed on the Property was for the residential use of his family. There was also substantial evidence presented by the Petitioners indicating that the Property was used by Rabbi Rivkin and his wife as a "Chabad House" that hosted numerous events throughout the year for college students that were advertised widely through a Facebook page maintained by the

maintained by the Rabbi. In addition, the evidence presented at the hearing demonstrated that the new addition includes, among other features, a cloak room, separate men's and women's bathrooms, and a commercial kitchen – all of which would indicate use for events of large groups of people, rather than family gatherings.

While I wholly agree with the majority's assessment of Rabbi Rivkin's testimony regarding the use of the Property as evasive and truculent, I am not able to agree to an Order granting the Special Hearing relief sought by the Petitioners. Instead, as Judge Beverungen decided below, I believe the wiser course would be to deny the Petition for Special Hearing and leave it to the code enforcement officials of the Department of Permits, Approvals and Inspections to determine on a case-by-case basis whether the Property's use violates the Baltimore County Zoning Regulations.

September 5 2017
Date

James H. West